Argued and submitted March 19, reversed and remanded December 3, 2014

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## REED SCOTT KOCH,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR1112062; A151401

341 P3d 112

Kali Montague, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Joanna L. Jenkins, Assistant Attorney General, argued the cause for respondent. With her on the briefs were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Haselton, Chief Judge, and Wollheim, Senior Judge.

HASELTON, C. J.

## HASELTON, C. J.

Defendant appeals a judgment of conviction for driving under the influence of intoxicants (DUII), ORS 813.010. Defendant argues that the trial court (1) erred in denying his motion to suppress urinalysis test results that were obtained after officers violated defendant's rights under Article I, section 12, of the Oregon Constitution, and (2) committed plain error by imposing a $255 conviction fee pursuant to ORS 813.030. We reach the first assignment of error only; the nature of our disposition obviates any need to consider the second assignment of error. As explained below, we conclude that, under the totality-of-the-circumstances analysis established in *State v. Jarnagin*, 351 Or 703, 277 P3d 535 (2012), the urinalysis derived from a constitutional violation, and the trial court's admission of that evidence requires that defendant's conviction be reversed and the case be remanded.

We review the denial of a motion to suppress for errors of law and are bound by the trial court's factual findings that are supported by sufficient evidence in the record. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). In this case, the trial court made certain factual findings concerning the motion to suppress. In describing the pertinent events, therefore, we draw from those express findings, together with other undisputed facts contained in the record and reasonable inferences consistent with the trial court's ruling. *See Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968) (in the absence of express findings, we generally presume that the trial court decided factual issues consistently with its ultimate conclusion).

On the morning of June 7, 2011, defendant, who was under post-prison supervision, drove to the Clackamas County Work Release Center.[1] An intake deputy at the center observed that defendant "appeared to be under the influence of something" and knew that defendant had just driven himself there. The intake deputy subsequently contacted the Milwaukie Police Department, prompting a DUII investigation.

---

[1] The record does not disclose the crime for which defendant was under post-prison supervision, nor whether defendant was required to submit to urine testing as a condition of post-prison supervision.

Officers Neitch and Hall arrived at the center around noon. They immediately went to the small meeting room where defendant was waiting. Upon encountering defendant, the officers observed that he appeared glassy-eyed and lethargic, had droopy eyelids, and nodded off at times. After introducing themselves and advising defendant that they were investigating him for DUII, the officers questioned him about his activities that morning. They asked whether defendant had driven to the work release center; defendant admitted that he had. The officers asked defendant if he had consumed alcohol, which defendant denied, or drugs, which defendant admitted. In particular, defendant said that, before his arrival at the work release center, he had consumed several prescription medications—Suboxone, Pristiq, and Seroquel—all of which are controlled substances.[2]

Approximately 10 to 15 minutes after the encounter began, the officers, concerned that circumstances had become compelling, read the *Miranda* warnings to defendant, who, in turn, indicated his understanding. Neitch then asked defendant if he would perform a series of field sobriety tests. Defendant responded that he was not willing to perform the tests and that he wanted to speak to his attorney. Hall replied that, "at this point in the investigation," defendant "wouldn't be able to speak to an attorney," but that there would be "ample opportunity to make a phone call" later on. Hall proceeded to read a *Rohrs* admonishment—that is, a warning that refusal to submit to physical tests could be used against defendant in court, *see State v. Rohrs*, 157 Or App 494, 499, 970 P2d 262 (1998), *aff'd*, 333 Or 397, 40 P3d 505 (2002)—and demonstrated a physical test. Hall again asked defendant to perform the field sobriety tests, and, this time, defendant complied.

Defendant performed poorly on the field sobriety tests. Despite defendant's earlier invocation of his right to counsel, Hall asked defendant "how he thought he did on the test," to which defendant replied, "not so good."

___

[2] The record is silent as to whether defendant had prescriptions for those medications.

After the field sobriety tests were completed, the officers placed defendant under arrest and transported him to the police station. Nothing in the record indicates that the officers readvised defendant of his *Miranda* rights at that point—or at any other point during the investigation. At the station, the officers sought defendant's consent to an Intoxilyzer test, as well as his participation in a Drug Recognition Evaluation (DRE).[3] Hall read an implied consent form, advising defendant of the rights and consequences related to taking or refusing a breath test.[4] Defendant agreed to submit to an Intoxilyzer breath test, which Hall administered. While Hall and defendant were in the testing room, Hall asked whether defendant would drive with a person in his current condition; defendant replied that no, he would not. Hall also asked how much medication defendant had taken. Defendant responded that he took an extra quarter pill of the Seroquel, which he thought had affected his ability to drive.

After the Intoxilyzer showed that defendant had 0.0 percent blood alcohol content, Officer Funkhouser, a drug recognition expert, took over the investigation from Hall and Neitch. Funkhouser proceeded with the DRE, which included another interview with defendant.

At the end of the DRE, defendant gave a sample of his urine to Funkhouser. That urine later tested positive for methamphetamine, as well as two prescription medications, Pristiq and Lamictal.

Defendant was charged with DUII. The state alleged that defendant "did unlawfully drive a motor vehicle * * * while under the influence of intoxicants, to-wit: controlled substances." Defendant filed a motion to suppress, alleging,

---

[3] A DRE is a 12-step procedure by which officers detect the probable source of a driver's impairment. It includes urine testing, blood alcohol content analysis, physical tests and checks, as well as "a focused interrogation and observation of the subject's behavior." *State v. Sampson*, 167 Or App 489, 493-95, 6 P3d 543, *rev den*, 331 Or 361 (2000).

[4] The implied consent form consists of two sections. Section 1 pertains to breath and blood testing; section 2 pertains to urine testing. At the bottom of the form there is a space to record the type of test ("breath/blood/urine") requested and any verbal response to that request. Marks on the form indicate that Hall went over section 1 with defendant, but did not cover section 2.

among other things, a violation of his right to an attorney under Article I, section 12, and seeking suppression of all statements, the field sobriety tests, the DRE, and the urinalysis. At the suppression hearing, the trial court heard extensive testimony from Neitch and Hall, who described the entire interaction with defendant as "polite" and "cooperative."[5] The main issue at the hearing was whether a *Miranda* violation had occurred; the parties' arguments focused on whether, and at what point, defendant was in custody or under compelling circumstances. The trial court noted that reading defendant his *Miranda* rights but then refusing to honor his request for counsel was "confusing, if not misleading," with respect to the meaning of that right.

The trial court issued a letter opinion, rendering the following findings of fact concerning the motion to suppress:

"Defendant drove himself to the Clackamas County Work Release Center (WRC) and presented signs of impairment at the intake. Milwaukie PD Officer[s] Hall and Neitch were dispatched to the WRC to investigate a possible DUII. During the course of the investigation, Officer Neitch read Defendant his Miranda warnings and asked if he would be willing to take Field Sobriety Tests (FST). Defendant declined to take FST and asked to speak with an attorney. Officer Hall read Defendant a *Rohrs* admonishment, conducted FST and administered a breath test. Defendant made admissions to the officers and consented to a urine sample."

Based on those findings and the parties' arguments, the trial court suppressed the "statements made by the Defendant," but admitted the results of the field sobriety tests, DRE, and—at issue here—the urinalysis. The state subsequently requested clarification from the trial court regarding the scope of its ruling, specifically inquiring as to the admissibility of statements made before and after defendant's request for counsel.

In response, the trial court deemed the pre-invocation statements to be admissible and the post-invocation statements inadmissible, but did not explain its reasoning. To rule as it did, however, the trial court necessarily determined

---

[5] Funkhouser, who conducted the DRE and collected the urine sample from defendant, did not testify at the suppression hearing.

that the circumstances became compelling around the time that the *Miranda* advice was given, that defendant invoked his right to counsel, and that, by continuing to question defendant, the officers violated Article I, section 12. Because the trial court admitted the urinalysis results despite that violation, it necessarily determined that the urine sample did not sufficiently derive from that violation.

The parties agreed to a bench trial on stipulated facts, which included the urinalysis and Intoxilyzer results. The trial court found defendant guilty of "operating a motor vehicle while under the influence of controlled substances; namely, methamphetamine *** [as well as] norvenlafaxine and lamotrigine [*i.e.*, Pristiq and Lamictal]."

The court later entered a judgment sentencing defendant to 48 hours' incarceration, 24 months' probation, a three-year driver's license suspension, and various fines and fees. Defendant timely appealed.

On appeal, defendant seeks reversal of his conviction, arguing that the trial court erred in admitting the urinalysis, because that evidence derived from the prior *Miranda* violation—*viz.*, the officers' continued interrogation after defendant invoked his right to counsel. The state concedes that a violation did occur and does not argue that defendant waived his right to counsel, but maintains that there is sufficient evidence in the record to support a determination that the urinalysis did not derive from the violation.[6] For the reasons that follow, we conclude, consistently with *Jarnagin*, that the trial court erred in denying suppression of the urinalysis because that evidence derived from the prior *Miranda* violation.

---

[6] The state also posits, for the first time on appeal, that, regardless of defendant's post-invocation statements, the police would nevertheless have obtained the urine sample and, thus, the denial of suppression should be affirmed on alternative grounds of inevitable discovery or independent source. However, the state never raised those contentions, which very probably would have affected the development of the record, before the trial court. Accordingly, we decline to consider them. *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) ("[E]ven if the record contains evidence sufficient to support an alternative basis for affirmance, if the losing party might have created a *different* record below had the prevailing party raised that issue, and that record could affect the disposition of the issue, then we will not consider the alternative basis for affirmance." (Emphasis in original.)).

Article I, section 12, provides that "[n]o person shall * * * be compelled in any criminal prosecution to testify against himself." That constitutional proscription requires police to give *Miranda* warnings before questioning suspects who are in custody or under compelling circumstances and, once a suspect has invoked the right to counsel, to cease questioning or obtain a valid waiver. *State v. Isom*, 306 Or 587, 595, 761 P2d 524 (1988) (admonishing that police have an "absolute obligation to cease all questioning once the request for counsel has been made"); *State v. Doyle*, 262 Or App 456, 464-65, 324 P3d 598, *rev den*, 355 Or 880 (2014) (describing *Miranda* requirements and possibility of waiver where suspect has initiated further contact with police).

Concomitantly, when police violate those duties, "we suppress not only the statements that a suspect makes in direct response" to unlawful interrogation, but also any evidence, physical or testimonial, "that derives from or is a product of that constitutional violation." *Jarnagin*, 351 Or at 713, 715-16 (suppressing later obtained statements); *see also State v. Vondehn*, 348 Or 462, 476, 236 P3d 691 (2010) (suppressing later obtained physical evidence); *cf. State v. McAnulty*, 356 Or 432, 457-58, 338 P3d 653 (2014) (suppressing statements obtained through continued interrogation after suspect invoked right to silence). The disposition of this appeal turns on whether the disputed urine sample fell within the latter category of suppression evidence— that is, evidence that "derives from or is the product of" the *Miranda* violation. *Jarnagin*, 351 Or at 713.[7]

Our consideration is substantially framed, and informed, by the "totality of the circumstances" analysis employed in *Jarnagin*, 351 Or at 716-17. Accordingly, we begin by relating, in some detail, *Jarnagin*'s circumstances and reasoning.[8]

---

[7] Defendant's post-invocation statements, which the trial court suppressed, fall (of course) within the first, "direct response" category.

[8] *Jarnagin* also clarified that the methodology set out in *State v. Hall*, 339 Or 7, 24-25, 115 P3d 908 (2005), does not apply in the context of Article I, section 12, which obviates the need to consider whether recent modifications to that methodology, *see State v. Unger*, 356 Or 59, 333 P3d 1009 (2014), affect our analysis. *Jarnagin*, 351 Or at 717 n 9.

In *Jarnagin*, police had several conversations with the defendant after an infant who had been in his care was hospitalized with grave injuries, which resulted in her death a few days later. *Id.* at 705, 713. At the hospital, on the evening of the incident, an officer confronted the defendant with his doubts about the defendant's account of how the child had been injured and urged the defendant to tell him what had really happened. The defendant then recounted a more elaborate version of the events. The police asked whether the defendant would be willing to reenact those events at home, while officers videotaped him. The defendant consented and, the next day, officers came to his home and videotaped the defendant as he demonstrated and narrated, step by step, the events that he had described the night before at the hospital. *Id.* at 708-10.

The defendant was eventually charged with multiple felonies, including murder by abuse, and moved to suppress the statements made in the video reenactment. The defendant argued that the officers violated Article I, section 12, when they failed to advise him of his *Miranda* rights before the interview at the hospital, and that the statements made during the video reenactment the next day were the product of that violation. The trial court concluded that the circumstances at the hospital were compelling and excluded those statements, and, ultimately, excluded the video reenactment statements on the ground that they were tainted by previously suppressed evidence. *Id.* at 713-14.

On direct appeal, the Oregon Supreme Court upheld the suppression of the video evidence. In so ruling, the court explained the analytical framework for determining "whether physical or testimonial evidence derives from or is the product of an earlier *Miranda* violation." *Id.* at 716. Specifically, the court stated:

"This court has looked to the totality of the circumstances in determining whether physical or testimonial evidence derives from or is the product of an earlier *Miranda* violation. Among other things, the court has considered the nature of the violation, the amount of time between the violation and any later statements, whether the suspect remained in custody before making any later statements, subsequent events that may have dissipated the taint of

the earlier violation, and the use that the state has made of the unwarned statements. The inquiry is a fact-intensive one—whether, considering all the circumstances, a defendant's later decision to speak to officers is sufficiently a product of an earlier *Miranda* violation that suppression is necessary to vindicate the defendant's Article I, section 12, rights."

*Jarnagin*, 351 Or at 716-17 (citations omitted).

Evaluating the facts in light of those considerations, the *Jarnagin* court noted that the nature of the underlying violation was "not flagrant." Although the officers had failed to recognize that the circumstances at the hospital were compelling, they had not committed a flagrant violation such as "advis[ing the] defendant of his *Miranda* rights and then proceed[ing] to question him despite repeated requests for counsel." *Id.* at 717 (citing two involuntary confession cases, *State v. Foster*, 288 Or 649, 607 P2d 173 (1980) (involving skillful, nighttime custodial interrogation), and *State v. Mendacino*, 288 Or 231, 603 P2d 1376 (1980) (police elicited confessions by subjecting suspect to three sessions of custodial interrogation)).

With respect to the second factor, *viz.*, "the amount of time between the violation and any later statements," the Supreme Court noted that "a change in time and circumstances can be sufficient to dissipate the effects of an earlier *Miranda* violation[,]" but deemed the changes that had taken place between the violations and the video reenactment to be of little consequence. *Jarnagin*, 351 Or at 716-18. In particular, the court noted that there was a 15- to 16-hour break between the hospital conversation and the video reenactment, and that the video reenactment did not take place under compelling circumstances (significantly, the defendant was not in custody at any time during that period). *Id.* at 717.

Ultimately, the Supreme Court concluded that the use that the police had made of the unwarned statements in obtaining the video reenactment, paired with the absence of any mitigating event, was dispositive, compelling suppression. In particular, the court emphasized the close causal link between two sets of statements, as well as their shared content:

"Not only did the video reenactment memorialize on film the statements obtained in violation of defendant's rights the night before, but defendant's unwarned statements at the hospital became, in effect, the script that he acted out the next day while the officers videotaped him. In that circumstance, it is difficult to see how the video reenactment was not the product of the undisputed *Miranda* violation the night before. No advice of *Miranda* rights intervened to break the causal chain. Indeed, there is no evidence in this record of what the officers said to defendant between the time that they obtained his agreement to participate in the video reenactment at the hospital and the time that they appeared on his doorstep the next day with video equipment in hand. * * *

"* * * [T]he identity between the two sets of statements and the state's use of defendant's unwarned statements in the video reenactment the next day persuade us that the break in time and the absence of compelling circumstances during the reenactment were not sufficient to break the causal chain in this case. We accordingly agree with the trial court that the video reenactment was the product of the *Miranda* violation the night before and should be suppressed."

*Id.* at 718-19 (footnote omitted).[9]

---

[9] *McAnulty* also provides an example of the *Jarnagin* analysis. In *McAnulty*, the defendant was questioned in connection with the death of her 15-year-old daughter, who had suffered prolonged abuse, torture, and starvation. The admissibility of statements obtained during four interrogation sessions was at issue on appeal. The police committed a *Miranda* violation during the first interrogation, and the defendant made a number of inculpatory statements in three subsequent interrogations. The Oregon Supreme Court concluded that statements made during the second interrogation session were the product of the prior violation, noting that there was "no significant temporal break" between the first and second interrogations, that "the same parties were present in the same room[,]" and that "[t]here was no significant difference in the quality of the statements elicited." 356 Or at 458.

The court concluded, however, that statements elicited during the third and fourth interrogations "were not a product of the earlier illegality." *Id.* The court explained that, one hour after the second interrogation ended, the defendant had "initiated the third interrogation by stating that she had something to tell [the police,]" also noting that the statements that followed were "qualitatively different than the more limited admissions that she had made previously." *Id.* As for the fourth interrogation, the court explained that the defendant had effectively waived her rights at the outset, and that it "occurred approximately six hours after the third and after defendant had initiated a discussion in the third interrogation." *Id.* at 459; *see also* 267 Or App at 334 n 13.

Thus, *Jarnagin*. Consistently with its instruction, we begin by considering the nature of the violation here that antedated the obtaining of the urine sample: The police failed to cease questioning—and, indeed, repeatedly questioned defendant—following his request to speak to an attorney. In particular, police questioned defendant after the field sobriety tests and in the Intoxilyzer room, as well as conducted an interview as part of the DRE. 267 Or App at 324, 325. That questioning, including the rigorously structured and "focused" context of the DRE interrogation, elicited patently inculpatory responses. *Id.* Thus, in striking contrast to the "not flagrant" violation in *Jarnagin*, 351 Or at 717, where officers failed to administer *Miranda* warnings under compelling circumstances, here, the officers' persistent questioning notwithstanding defendant's unequivocal invocation of the right to counsel was a flagrant violation—one likely to "create[] the impression that the assertion of one's rights [is] meaningless." *Foster*, 288 Or at 656.

Furthermore, the officers' direct response (or, more precisely, nonresponse) to defendant's request for counsel contributed to the events that followed. As the trial court noted, the officers' refusal to honor defendant's request to speak to his attorney—and telling defendant that he was not yet entitled to do so—likely confused defendant, particularly because the officers had just advised him of his right to an attorney and his right to remain silent. 267 Or App at 326. Under the circumstances, conducting the investigation in that manner exacerbated the effect of the unlawful questioning.[10]

*Jarnagin*'s second consideration is temporal—*viz.*, the time that elapsed between the violation and the point at which the police obtained the evidence at issue. In *Jarnagin*, the court concluded that the 15- to 16-hour interlude between the violation and the video reenactment was "not sufficient to break the causal chain [between the two events]." 351 Or at 719. Here, the temporal nexus was even stronger—much

---

[10] We do not mean to suggest that, upon defendant's request for counsel, the police were required to grant him immediate access to an attorney. In the present case, we emphasize, the police sought and obtained testimonial evidence from defendant after he invoked his right to an attorney, and the urine sample was obtained only after the police had unlawfully elicited defendant's inculpatory statements.

stronger. The unlawful questioning occurred intermittently throughout the encounter, including, significantly, just before defendant gave the urine sample (the DRE interrogation). There was no significant break between the violation and the procurement of the urine sample, let alone a change in time "sufficient to dissipate the effects of an earlier *Miranda* violation." *Id.* at 718; *see also McAnulty*, 356 Or at 458 (suppressing statements obtained "immediately after" *Miranda* violation).

With respect to *Jarnagin*'s third consideration— "whether the suspect remained in custody" during the relevant time frame—the circumstances here again militate far more powerfully in favor of suppression than did those in *Jarnagin*. Whereas in *Jarnagin*, the defendant was not in custody, and the circumstances went from compelling (during the hospital conversation) to not compelling (during the video reenactment, at the defendant's home), here defendant was under compelling circumstances within 15 minutes of the initial encounter and was under arrest when he gave the urine sample.

As for *Jarnagin*'s consideration pertaining to "subsequent events that may have dissipated the taint of the earlier violation," the record here is silent. 351 Or at 716. The state adduced no evidence of what the police said to defendant prior to collecting the urine sample, must less any "dissipating" interaction.[11] Indeed, there is no evidence that defendant was given the implied consent information necessary to make an "informed choice" concerning the urine test. *State v. Moore*, 354 Or 493, 502-03, 318 P3d 1133 (2013), *adh'd to as modified on recons*, 354 Or 835 (2014).[12]

---

[11] As noted, the officer who obtained the urine sample did not testify at the suppression hearing, and neither Neitch nor Hall was present during the DRE. 267 Or App at 325, 326 n 5; *cf. Jarnagin*, 351 Or at 718 ("Indeed, there is no evidence in this record of what the officers said to [the] defendant between the time that they obtained his agreement to participate in the video reenactment at the hospital and the time that they appeared on his doorstep the next day with video equipment in hand.").

[12] Marks on the implied consent form indicate that the breath testing information, but not the urine testing information, was read to defendant before he submitted to the Intoxilyzer. 267 Or App at 325 n 4. *See* ORS 813.100(1) (requiring that, before a test is administered, "the person requested to take the test shall be informed of consequences and rights as described under ORS 813.130"); ORS 813.130 (setting out "rights and consequences" information that must be

Thus, as in *Jarnagin,* the state failed to establish any subsequent event that "intervened to break the causal chain" between the violation and the later obtained urinalysis. 351 Or at 718.[13]

We turn, finally, under *Jarnagin's* construct, to consider what use the police made of the suppressed statements in obtaining the urine sample. *See id.* (emphasizing correspondence between unlawfully elicited statements and subsequent video reenactment statements). Here, defendant initially acknowledged his impairment in response to unlawful post-invocation questioning following the field sobriety tests. Later, defendant admitted that that impairment was due to controlled substances when he told Hall about taking an extra quarter pill of Seroquel and that he thought that extra dosage had impaired him. Finally, the DRE interrogation and the urine sample were part and parcel of the same DRE protocol; both were orchestrated in the same setting, by the same officer, and were components of the 12-step DRE designed to determine and confirm the cause of defendant's impairment, as admitted in his unlawfully elicited inculpatory statements. Thus, in the totality of the circumstances, defendant's post-invocation admissions were inextricably intertwined with seeking, and obtaining, the urine sample.

In sum, by continuing to question defendant after he invoked his right to an attorney, the police committed a "flagrant" violation, and the timing and circumstances of the investigation amplified the effect of that violation. Further, the giving of the urinalysis was merely the final step of an integrated process permeated by defendant's unlawfully elicited admissions. Accordingly, we conclude

---

disclosed under implied consent scheme); ORS 813.131 (establishing implied consent to take a urine test in certain circumstances); ORS 813.132 (setting out consequences of refusing to take a urine test and information that must be disclosed before a urine test is administered).

[13] In both *Jarnagin* and *McAnulty,* the Oregon Supreme Court declined to suppress post-*Miranda*-violation statements that were obtained subsequent to an effective, albeit belated, *Miranda* warning and a valid waiver. *Jarnagin,* 351 Or at 719-25; *McAnulty,* 356 Or at 458-59. *McAnulty* also declined to suppress statements obtained during an interrogation that had been initiated by the defendant. *Id.* at 458. As discussed above, in the present case, no such event occurred prior to the procurement of the urine sample.

that defendant's decision to give the urine sample was so "sufficiently a product of [the] earlier *Miranda* violation[s]" as to compel suppression. *Jarnagin*, 351 Or at 717.

The state argues, nevertheless, that the request for consent to the urinalysis was not prompted by the statements that were suppressed but, instead, by lawfully obtained evidence—*e.g.*, the officers' observations of defendant's impairment, as well as defendant's pre-invocation admissions to consuming prescription medications and to driving. In this context, that contention is unavailing for either of two reasons. First, to the extent that the state is positing an "independent source"-like argument, that contention was never presented to the trial court—*see* 267 Or App at 327 n 6—and, indeed, is unsubstantiated in this record, not the least because Funkhouser, who administered the DRE and requested and obtained the urine sample, did not testify at the suppression hearing. *See* 267 Or App at 326 n 5. Second, to the extent that the state's contention partakes of a *Hall/Unger* construct, that methodology is inapposite here. *Jarnagin*, 351 Or at 717 n 9. Rather, here, the constitutionally prescribed focus is not on whether the police would have asked for the urine sample, but, instead (again), whether "defendant's later decision [to give the urine sample] is sufficiently a product of an earlier *Miranda* violation that suppression is necessary to vindicate * * * defendant's Article I, section 12, rights." *Id.* at 717.

Having concluded that the trial court erred, we cannot say that, notwithstanding the erroneously admitted urinalysis, there was "little likelihood" that the evidence affected the verdict. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). The state concedes that, because this case involves a controlled substance DUII, erroneous admission of urinalysis would not be harmless. That concession is well taken. Given the totality of the evidence, the urinalysis result was significant to the verdict because it was direct scientific evidence that defendant's impairment was due to the influence of controlled substances. *State v. Fong*, 226 Or App 493, 499, 204 P3d 146, *rev den*, 347 Or 43 (2009); *see State v. Bevan*, 235 Or App 533, 543, 233 P3d 819 (2010) (erroneous admission of scientific evidence weighs against a conclusion that an error was harmless). Moreover, as the

sole evidence, scientific or otherwise, of methamphetamine consumption, the urinalysis was "qualitatively different" from the other evidence. *Davis*, 336 Or at 34. Accordingly, the admission of the urinalysis was not harmless, and we must reverse the DUII conviction.

Reversed and remanded.