TOOKEY, J.
*279 Defendant appeals a judgment of conviction for driving under the influence of intoxicants (DUII), ORS 813.010, which the court entered following defendant's conditional guilty plea. The issue on appeal is whether the trial court erred when it partially *421 denied defendant's motion to suppress evidence.
The trial court determined that a law enforcement officer impermissibly interrogated defendant, in violation of defendant's rights under Article I, section 12, of the Oregon Constitution, because defendant did not understand her Miranda rights and because defendant equivocally invoked her right to remain silent.[1] As a result, the trial court suppressed the statements that defendant made following field sobriety tests and defendant's responses to a series of questions that the officer asked to complete a DUII interview report. However, the trial court declined to suppress evidence of defendant's blood alcohol content (BAC), which the officer obtained when defendant agreed to take a breath test.
Defendant assigns error to that ruling, arguing that the "trial court should have suppressed the breath test results because that evidence derived from the exploitation of the violation of defendant's Article I, section 12, right." For the reasons that follow, we conclude that the trial court erred in failing to suppress the evidence of defendant's BAC and, accordingly, we reverse and remand.
I. BACKGROUND
We review the denial of a defendant's motion to suppress for legal error and are bound by the trial court's express factual findings if evidence in the record supports them. State v. Ehly , 317 Or. 66, 74-75, 854 P.2d 421 (1993). "If findings of historical fact are not made on all pertinent issues and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the court's *280 ultimate conclusion." Id . at 75, 854 P.2d 421. We recount the facts in accordance with that standard.
A. Facts
At 4:21 p.m., Sergeant Marl received information from a concerned citizen about defendant driving erratically near the Milwaukie Marketplace. The citizen informed Marl that she had almost had a head on collision with defendant, because defendant was driving the wrong way coming out of the Milwaukie Marketplace, and that defendant was currently in the drive-through of a Taco Bell. After receiving that information and a description of defendant's car, Marl drove to the marketplace where he saw defendant's car leave the Taco Bell drive-through, run over a curb, and park in a through way between a Shari's and the Taco Bell.
Marl approached defendant's car and observed that she appeared to be "passed out[,] *** slumped over and wasn't moving." Marl then noticed that defendant was not passed out, but that "she was actually trying to eat some food that she had got at Taco Bell." Defendant "slowly looked up at [Marl] and she had some food running down her chin" and "dripping into her lap, but she told [Marl] that she was okay." Marl observed that defendant's "eyes were watery, her speech was slurred," and her movements were "slow and methodical." Marl asked defendant how much she had to drink, and defendant replied that she had "one drink" at home. Because Marl suspected defendant of DUII, he alerted other officers in the area and asked defendant to perform some field sobriety tests. Defendant agreed to take the field sobriety tests.
At 4:26 p.m., Officer Downey arrived on his motorcycle and continued the DUII investigation. Downey "noticed a faint odor of alcohol," that defendant's "eyes were glassy, her face was flushed, her speech was slurred, * * * that her hand and body motions were slow and sluggish[,] and that she was sitting behind the wheel of her vehicle and was swaying back and forth." After observing defendant, Downey thought that defendant had been driving under the influence of intoxicants, and he also obtained defendant's consent to perform field sobriety tests.
*281 Defendant performed the horizontal gaze nystagmus test (HGN), part of the walk-and-turn test, and part of the one-leg stand test. Downey observed multiple "clues" on the HGN test that indicated that defendant was under the influence of intoxicants.
*422 When Downey administered the walk-and-turn test, he noticed that defendant "was swaying in a circular motion," that none of her steps were heel to toe, and that defendant "couldn't walk on the white line." Defendant stated that she could not complete the walk-and-turn test "because she had dyslexia" and she sat down on the curb. Downey then demonstrated the one-leg stand test for defendant, but defendant "couldn't stand without swaying" and she sat back down on the curb. Defendant stated that she could not perform the one-leg stand test "because she had dementia." At that point, Downey asked defendant "if she should be driving, if she had been drinking and had dementia and dyslexia." Defendant responded, "Probably not." When asked by Downey how defendant felt "on a scale of one to ten with zero being completely sober and ten being falling down drunk," defendant replied that "she was a two."
At 4:41 p.m., Downey arrested defendant for DUII, advised defendant of her Miranda rights, and asked defendant if she understood those rights. Defendant said, "No." Downey then read defendant her Miranda rights a second time and asked defendant if she understood those rights. Defendant said, "No." Downey followed up by going through each right, trying to express each right in simpler terms, and asked defendant a third time if she understood her rights. Defendant did not respond, and Downey had Marl transport defendant to the holding facility at the Milwaukie Police Department.
At 5:02 p.m., Downey began the observation period for the breath test by filling out some paperwork and by checking defendant's mouth to make sure there were no foreign substances that would compromise the breath test results. Downey then interviewed defendant using the Oregon State Police alcohol influence interview report, which is designed to gather evidence for DUII investigations. After asking defendant 28 questions from the alcohol influence interview report and documenting her responses, Downey read *282 defendant the implied consent "rights and consequences" form. After each paragraph, Downey asked defendant whether she understood that paragraph. When defendant indicated that she did not understand a paragraph, Downey reread the paragraph again until defendant indicated that she understood. Downey wrote defendant's answers down on the implied consent form. Additionally, at some point during the 45-minute-long observation period, defendant and Downey "had a long conversation about [defendant's] motor officer tattoo," and discussed their mutual acquaintances in the Portland Police motorcycle unit.
At the end of the observation period, fifteen minutes had elapsed from the time Downey completed the alcohol influence interview report and when Downey asked defendant whether she would take a breath test. When Downey asked defendant to take a breath test, defendant said, "Yeah," and took the breath test at 5:47 p.m. The breath test showed that defendant's BAC was 0.29.[2] Defendant was subsequently charged with DUII.
B. Trial Court Proceedings
Before trial, defendant filed a motion to suppress "(1) the unlawfully administered field sobriety tests; (2) the unlawful questioning of [defendant]; and (3) the unlawfully administered breath test." More specifically, defendant argued that she did not consent to the field sobriety tests and that the other evidence was the product of a Miranda violation that occurred when Downey "interrogated [defendant] after having read her Miranda warnings despite the fact that [defendant] responded to the officer that she did not understand her rights."
In response, the state contended that defendant voluntarily consented to perform the field sobriety tests and that "defendant was properly Mirandized." Additionally, the state argued that, even if defendant was not properly Mirandized, the breath test results were not derivative of any Miranda violation. In *423 support of its argument that *283 defendant's consent to take the breath test was not derived from a violation of defendant's Article I, section 12, rights, the state contended that Downey reading defendant the implied consent form attenuated the Miranda violation. In the alternative, the state argued that the breath test results would be admissible irrespective of any Miranda violation because the state could lawfully conduct the search and seizure under the exigency or search incident to arrest exceptions to the warrant requirement under Article I, section 9, of the Oregon Constitution and, therefore, defendant had no constitutional right to refuse the breath test and her valid consent was not necessary.[3]
The trial court partially agreed with defendant, concluding that, after Downey had administered the field sobriety tests, the circumstances had become sufficiently compelling to require Miranda warnings.[4] The trial court further concluded that Downey violated defendant's Article I, section 12, rights because defendant unequivocally stated that she did not understand her Miranda rights, and because Downey failed to clarify whether she was equivocally invoking her right to remain silent before questioning defendant at the holding facility. As a result, the trial court suppressed the statements that defendant made following the field sobriety tests and her responses to the 28 questions from the Oregon State Police alcohol influence interview report.
Regarding the BAC evidence, the trial court concluded that defendant's consent to take the breath test was sufficiently attenuated from the Miranda violation. The trial court explained that the taint from the Miranda violation had dissipated by the time defendant consented to a breath test because it was not "a flagrant violation of her rights," and because Downey reading and then rereading defendant *284 the implied consent form was a "significant" intervening event that created "a sufficient time gap" to attenuate the prior violation. Accordingly, the trial court ruled that the breath test results were admissible. The trial court did not make any findings or reach any conclusions with respect to the state's exigency or search incident to arrest arguments. Following the trial court's ruling on defendant's motion to suppress, defendant entered a conditional guilty plea.
II. ISSUES ON APPEAL
On appeal, defendant argues that the trial court erred when it failed to suppress the breath test result because the "[p]olice violated Article I, section 12, of the Oregon Constitution by questioning defendant without confirming that defendant understood her Miranda rights" and the breath test results were "derived from the Article I, section 12, violation." The state's response is two-fold. First, the state argues that the "breath test evidence was not derived from a violation of Article I, section 12, because defendant had no right to refuse the test" under Oregon's implied consent law. Second, the state argues, in the alternative, that, "under the totality of the circumstances, defendant's decision to submit to a breath test was not derived from a violation of Article I, section 12."
However, in light of the Supreme Court's intervening issuance of State v. Swan , 363 Or. 121, 420 P.3d 9 (2018), the parties have refined their positions.[5] The state concedes that the court in Swan rejected its argument that defendant had no legal right to refuse the test as a result of the implied consent statutes. See State v. Banks , 364 Or. 332, 337-39, 434 P.3d 361 (2019) (rejecting the *424 state's argument that, under the implied consent statutes, the defendant did not have a constitutional right to refuse the officer's request that he take a breath test); Swan , 363 Or. at 137-46, 420 P.3d 9 (rejecting the state's argument that the implied consent statutes require the admission of breath test results when the decision to take a breath test is the product of a violation of the defendant's Article I, section 12, rights). The state acknowledges *285 that, "[a]t first glance, this case appears to be very similar to Swan ," but argues that "the facts of this case are distinguishable from those in Swan in a number of key respects," and that an application of the factors in Swan lead to a conclusion "that the evidence was not derived from the Article 1, section 12, violation." Additionally, the state raises an argument that the "police lawfully were permitted to seize [the] breath-alcohol evidence without a warrant based on exigency and as a search incident to arrest."
Defendant contends that an application of the factors from Swan supports her contention that "[d]efendant's breath test results derived from the Article I, section 12, violation." Furthermore, defendant responds that the state's alternative bases for affirmance under the exigency and search incident to arrest exceptions to the warrant requirement fail "because [the state] does not explain how a questionably permissible search under Article I, section 9, alleviates a violation of a defendant's Article I, section 12, rights." We begin by addressing whether the breath test results were derived from Downey's violation of defendant's Article I, section 12, rights.
A. Causal Chain Analysis
Article I, section 12, requires police to provide Miranda warnings to a person that is subjected to custodial interrogation to ensure that a person's waiver of the right to remain silent and to consult with counsel is knowing and voluntary. State v. Vondehn , 348 Or. 462, 474, 236 P.3d 691 (2010). As discussed above, the trial court concluded that Downey violated defendant's Article I, section 12, rights when Downey subjected defendant to custodial interrogation because defendant unequivocally stated that she did not understand the Miranda warnings, and she equivocally invoked her right to remain silent. Because the trial court implicitly found that defendant did not understand those warnings, we must defer to that implicit finding. State v. Lunacolorado , 238 Or. App. 691, 695, 243 P.3d 125 (2010), rev. den. , 350 Or. 530, 257 P.3d 1020 (2011). A defendant " 'who does not understand the Miranda warnings' " does not understand that he or she has those rights, "and statements made *286 absent the defendant's understanding of those warnings * * * are presumptively involuntary and subject to suppression" because the defendant cannot validly waive those rights. State v. Finonen , 272 Or. App. 589, 591 n. 2, 356 P.3d 656 (2015) (quoting Lunacolorado , 238 Or. App. at 695, 243 P.3d 125 (emphasis in Finonen )). Furthermore, "[w]hen the defendant makes an ambiguous or equivocal invocation of [the right against self-incrimination] under Article I, section 12, * * * the police are required to ask follow-up questions to clarify what the person meant before proceeding with interrogation." State v. Avila-Nava , 356 Or. 600, 609, 341 P.3d 714 (2014). Downey did not ensure that defendant understood her rights or ask follow-up questions to determine whether defendant was exercising her right to remain silent.
Because a violation of defendant's Article I, section 12, rights occurred when Downey interrogated defendant using the Oregon State Police alcohol influence interview report, the disposition of this appeal turns on whether defendant's consent to take the breath test 15 minutes later was derived from the prior Miranda violation.[6]
"[T]he question whether testimonial or physical evidence derives from a prior Miranda violation cannot be reduced to a mechanical formula but will vary depending on the totality of the circumstances." Swan , 363 Or. at 131, 420 P.3d 9. As the court did in Swan , we look to the factors set out in State v. Jarnagin , 351 Or. 703, 277 P.3d 535 (2012), "in deciding whether the breath test results were admissible because defendant's decision *425 to take the breath test broke the causal chain between the prior Article I, section 12, violation and [her] breath test results." Swan , 363 Or. at 131, 420 P.3d 9. We consider, among other things:
"the nature of the violation, the amount of time between the violation and any later statements, whether the suspect remained in custody before making any later statements, subsequent events that may have dissipated the taint of the earlier violation, and the use that the state has made of the unwarned statements."
*287 Jarnagin , 351 Or. at 716, 277 P.3d 535. "The state bears the burden of production and persuasion to show that defendant's decision to take the breath test was not the product of [Downey's] violation of defendant's Article I, section 12, right[s]." Swan , 363 Or. at 133, 420 P.3d 9.
In Swan , the court applied the five Jarnagin factors to determine "whether the breath test results were admissible because defendant's decision to take the breath test broke the causal chain between the prior Article I, section 12, violation and his breath test results." Id . at 131, 420 P.3d 9. Regarding the first Jarnagin factor-the nature of the violation-the court concluded that the violation was flagrant and repeated because the defendant had invoked his right to counsel and, despite that invocation, the officer asked the defendant 28 questions from a DUII interview report. Id . at 133-34, 420 P.3d 9. With respect to the second and third factors-" 'the amount of time between the violation and any later statements' " and " 'whether the suspect remained in custody before making any later statements' "-the court concluded that those factors suggested that the "defendant's decision to take the breath test was the product of the immediately preceding Miranda violation" because "no time elapsed between the questions that [the officer] asked in violation of defendant's right to counsel and his question whether defendant would take a breath test," and because the "defendant remained in custody throughout that time." Id . at 131-32, 420 P.3d 9 (quoting Jarnagin , 351 Or. at 716, 277 P.3d 535 ). Finally, with respect to the fourth and fifth factors-whether subsequent events dissipated the taint of the earlier violation and the use that the state has made of the unwarned statements-the record did not disclose the substance of the 28 questions that the officer asked the defendant after he invoked his right to counsel, and only disclosed three of the warnings from the Implied Consent Combined Report that the officer read to the defendant. Id . at 132, 135, 420 P.3d 9. Consequently, the court concluded that "there is no way of knowing on this record whether the officer's illegal interrogation * * * effectively made defendant's decision to take the breath test a foregone conclusion" and, because the implied consent warnings did "not disclose any intervening information that * * * would have reminded [defendant] that he was free to not take the breath test," there was not *288 a subsequent event that dissipated the taint of the earlier violation. Id . at 132, 136, 420 P.3d 9. After considering those factors, the court concluded "that the state failed to prove that defendant's decision to take the breath test did not derive from the preceding repeated violation of defendant's Article I, section 12, right to counsel." Id . at 136, 420 P.3d 9.
With that background in mind, we turn to the application of the Jarnagin factors in this case.
1. Nature of the violation
Regarding the first factor-the nature of the violation-Downey violated defendant's Article I, section 12, rights when he took defendant into custody and subjected her to interrogation at the holding facility without ensuring that defendant understood her rights or clarifying whether defendant had invoked her right to remain silent. That violation of defendant's Article I, section 12, rights is not one of the most egregious or flagrant violations that we have analyzed under these circumstances. See Swan , 363 Or. at 133-34, 420 P.3d 9 (concluding that the violation was "flagrant and repeated" where the officer advised the defendant of his Miranda rights, took the defendant into custody, and then proceeded to ask the defendant 28 questions using the DUII interview report, despite the defendant's request for counsel);
*426 State v. Koch , 267 Or. App. 322, 332, 341 P.3d 112 (2014) (concluding that the violation was "flagrant" where the officer subjected the defendant to custodial interrogation by "repeatedly" questioning the defendant using a drug recognition evaluation after the defendant had requested to speak with an attorney). However, the violation in this case is also not one that we would characterize as not flagrant or repeated. See Jarnagin , 351 Or. at 717, 277 P.3d 535 (noting that the Miranda violation was "not flagrant" where "the officers failed to recognize that the circumstances had become sufficiently compelling to require Miranda warnings"); State v. Delong , 357 Or. 365, 374-80, 350 P.3d 433 (2015) (concluding that the violation was not flagrant where the officers failed to advise the defendant of his Miranda rights before obtaining his consent to search his car because there was no "prolonged stationhouse questioning" and the defendant invited *289 the officers to search his car unprompted by any express request for consent to search).
Here, we conclude that the nature of the violation lies somewhere between the flagrant and repeated violations in Swan and Koch and the non-flagrant violations in Jarnagin and Delong . On the one hand, when Downey read defendant her Miranda rights, defendant unequivocally stated twice that she did not understand her rights. Additionally, when Downey read defendant her Miranda rights a third time, defendant did not respond, indicating her apparent unwillingness to speak to Downey. Despite defendant's unequivocal response that she did not understand her rights and her apparent unwillingness to speak with Downey, Downey, knowing that the situation was sufficiently compelling to require Miranda warnings, continued to press forward without asking any more follow-up questions and then proceeded with the custodial interrogation. Downey's failure to seek clarification and to cease questioning-and, indeed, his repeated questioning of defendant using the Oregon State Police alcohol influence interview report-was the type of violation that could "create[ ] the impression that the assertion of one's rights is meaningless." State v. Foster , 288 Or. 649, 656, 607 P.2d 173 (1980).
On the other hand, when defendant first stated that she did not understand the Miranda warnings, Downey took the time to present those rights in simpler terms in an attempt to help defendant understand her rights.[7] Although Downey's attempt to present the Miranda rights in simpler terms could have had the effect of mitigating the violation, his failure to clarify whether defendant understood her rights or was invoking her right to remain silent before questioning defendant "place[d defendant] in a more disadvantaged position, making it easier and more likely for [Downey] to exploit that illegality to obtain [defendant's]
*290 consent" to take the breath test. State v. Unger , 356 Or. 59, 82, 333 P.3d 1009 (2014).
Given that Downey could not interrogate defendant at the holding facility using the Oregon State Police alcohol influence interview report because defendant did not understand her rights, we conclude that the violation was "repeated." Swan , 363 Or. at 134, 420 P.3d 9. Additionally, defendant "indicated that she wanted to go home * * * at least half a dozen" times while she was in custody. Downey's persistence in unlawfully interrogating defendant while she was in custody, despite her apparent unwillingness to speak with Downey, would indicate to defendant that she was unable to terminate the encounter and would likely affect her decision to submit to the breath test. Furthermore, Downey acknowledged that the alcohol influence interview report is designed to gather evidence for a DUII investigation. See Unger , 356 Or. at 82, 333 P.3d 1009 ("unlawful and lengthy in-custody interrogation" is conduct that "is more likely to affect the defendant's decision to consent than more restrained behavior"). Although Downey did not otherwise engage in any other overreaching *427 or overbearing conduct, we conclude that, on balance, the repeated nature of the violation tilts the scales in defendant's favor. See id . at 85, 333 P.3d 1009 ("polite police misconduct" does not necessarily mean that the subsequent consent is valid).
2. Amount of time between the violation and any later statements
As we explained in Koch , 267 Or. App. at 332, 341 P.3d 112, " Jarnagin 's second [factor] is temporal-viz ., the time that elapsed between the violation and the point at which the police obtained the evidence at issue." Here, 15 minutes had elapsed from the time Downey unlawfully interrogated defendant using the alcohol influence interview report and when Downey asked defendant whether she would take a breath test. As discussed in more detail below, the only intervening circumstance that occurred during those 15 minutes was Downey reading defendant the implied consent form. In Jarnagin , the court concluded that a 15- to 16-hour interlude between the violation and the point at which the police obtained the evidence at issue was "not sufficient to break the causal chain." 351 Or. at 717-19, 277 P.3d 535. The temporal nexus in *291 this case is even stronger than the nexus in Jarnagin and is analogous to the nexus in Swan . In Swan , the court stated that "no time elapsed between the questions that [the officer] asked in violation of defendant's right to counsel and his question whether defendant would take a breath test" when the only intervening event was the officer reading the defendant the "Implied Consent Combined Report." 363 Or. at 131-32, 135, 420 P.3d 9. Under those circumstances, the court concluded that "the prior illegality and defendant's decision to take the breath test blended into a continuum" because "there was no break in time, place, or custody between the officer's repeated Article I, section 12, violation and defendant's decision to take the breath test that might have attenuated the effect of the violation." Id . at 132, 420 P.3d 9 (internal quotation marks and citations omitted); see also State v. McAnulty , 356 Or. 432, 458, 338 P.3d 653 (2014) (suppressing statements obtained "immediately after" a Miranda violation); Koch , 267 Or. App. at 333, 341 P.3d 112 (concluding that the defendant's decision to give a urine sample was the product of an earlier Miranda violation when "[t]here was no significant break between the violation and the procurement of the urine sample, let alone a change in time 'sufficient to dissipate the effects of an earlier Miranda violation' " (quoting Jarnagin , 351 Or. at 718, 277 P.3d 535 )). Because only 15 minutes had elapsed from the time Downey unlawfully interrogated defendant and when Downey asked defendant whether she would take a breath test, the second factor also suggests that defendant's decision to take the breath test was the product of the preceding Miranda violation.
3. Whether defendant remained in custody before making any later statements
With respect to the third Jarnagin factor-whether the suspect remained in custody-defendant remained in custody from the time that Downey interrogated defendant at the holding facility in violation of her Article I, section 12, rights, to the time that Downey asked defendant whether she would take a breath test. Thus, "there was no break in time, place, or custody between the officer's repeated Article I, section 12, violation and defendant's decision to take the breath test that might have attenuated the effect *292 of the violation." Swan , 363 Or. at 132, 420 P.3d 9 ; see also Koch , 267 Or. App. at 333, 341 P.3d 112 (concluding that "the circumstances *** militate *** in favor of suppression" because the "defendant was under compelling circumstances within 15 minutes of the initial encounter and was under arrest when he gave the urine sample"). Because defendant was under compelling circumstances within 20 minutes of the initial encounter when she was placed under arrest, and there was no break in custody before Downey asked defendant to take a breath test, the third Jarnagin factor also militates in favor of suppression.
4. Subsequent events that may have dissipated the taint of the earlier violation
As for Jarnagin 's fourth factor-subsequent events that may have dissipated the *428 taint-the only intervening circumstance that the trial court found that occurred during the 15 minutes that elapsed between the unlawful interrogation of defendant and her consent to take the breath test was Downey reading defendant the implied consent form. Downey testified that, when he read defendant the implied consent form, Downey read the form sentence by sentence to defendant, sometimes rereading a paragraph to defendant several times, until Downey "got an affirmative response that [defendant] understood it." Downey recorded the number of times he had to read a paragraph and defendant's affirmative responses on the implied consent form, and the form was entered into evidence at the suppression hearing. The trial court found it "significant" that Downey read and then reread defendant the implied consent form to ensure that "she understood what * * * was involved in refusing or taking the breath test" in reaching its conclusion that defendant's consent to take the breath test was not derived from the Miranda violation.
In our opinion in State v . Swan , 276 Or. App. 192, 204-06, 366 P.3d 802 (2016), rev'd , 363 Or. 121, 420 P.3d 9 (2018), we, like the trial court in this case, found it "significant" that the officer had provided the "defendant with the implied consent information necessary to make an informed choice concerning the breath test at two different times," and concluded that the implied consent warnings were a subsequent event *293 that intervened to break the causal chain between the violation and the later obtained breath test results. The Supreme Court reversed our decision in Swan , noting that, although it has held that implied consent warnings, which advise a defendant of the consequences of refusing to take a breath test, do not render a defendant's consent involuntary, that question differs from the question of whether that "advice was sufficient to break the causal chain between the violation and [a] defendant's decision to take the breath test." 363 Or. at 135, 135 n. 7, 420 P.3d 9 (citing State v. Moore , 354 Or. 493, 503-05, 318 P.3d 1133 (2013) ). The Supreme Court stated that warning the "defendant of the adverse consequences of refusing to take the test would have tilted his decision towards submitting to the test" and, because the "record d[id] not disclose any intervening information that [the officer] told defendant that would have reminded him that he was free not to take the breath test," the court concluded that the state failed to prove that a subsequent event had dissipated the taint of the earlier violation. Id . at 134-36, 420 P.3d 9.[8]
Here, the implied consent form contains several admonitions about the consequences for refusing to take the breath test. In reading defendant the implied consent form, Downey advised defendant that, if she refused to take the breath test, "evidence of the refusal *** may be offered against you," "your driving privileges are subject to suspension for each test refusal," "[s]uspension for refusing a test is substantially longer than suspension for failing a test," "you will not be eligible for a hardship permit for at least 90 days, and possibly three years, after the suspension takes effect, depending on your driving record," "[i]f you *** have an Oregon driver license or permit, the license or permit will be taken immediately," and "you will be subject to a fine of $650." The state argues that "[t]hat information supports the trial court's inference that defendant's decision to take the test was based on a considered weighing of the *294 benefits and disadvantages of taking the test, rather than anything she said during the DUII interview." We disagree; "the point of informing a DUII suspect of the adverse consequences of refusing to take a breath test is not to ensure that the suspect's decision to refuse is knowing," rather, "it is to persuade a suspect to submit to the test." Swan , 363 Or. at 144-45, 420 P.3d 9 ; see also Banks , 364 Or. at 340-41, 434 P.3d 361 (observing that the legislative purpose with the implied consent advice and consequences "was to 'coerce a driver's submission to take the tests' " (quoting *429 State v. Cabanilla , 351 Or. 622, 632, 273 P.3d 125 (2012) )).
The implied consent form does not contain any information that would have reminded defendant that she had the right to remain silent or to consult with an attorney, or that she was free to refuse the breath test. See Swan , 363 Or. at 144, 420 P.3d 9 (under the implied consent laws, a DUII suspect also "retains a statutorily recognized right to decide, at the point of arrest, whether to cooperate with the state and take a breath test"); Vondehn , 348 Or. at 485-86, 236 P.3d 691 (concluding that, under the circumstances, "belated Miranda warnings" were "an objective indication that the situation had changed and was governed by new rules"). Although the implied consent warnings may have informed defendant of the adverse consequences of her refusal to take a breath test, we conclude that those warnings did not dissipate the taint of the earlier violation. See Swan , 363 Or. at 135-36, 145, 420 P.3d 9 ("[A]dvising a DUII suspect of the adverse consequences of refusing to take a breath test is intended to weight the suspects decision towards taking the test.").
The state also points to a "long conversation" that Downey had with defendant about defendant's "motor officer" tattoo and their mutual acquaintances, but the state adduced no evidence of when that conversation occurred during the 45-minute-long observation period. See id . at 133, 420 P.3d 9 (the "state bears the burden of production and persuasion"). Additionally, the trial court did not make any findings about when that conversation occurred or refer to that conversation in its attenuation analysis. However, the court did find that it "must have taken quite some time to go through [the implied consent form] line by line * * * writing down what [defendant's] answers were" during the 15 minutes *295 that elapsed from the time Downey unlawfully interrogated defendant and when Downey asked defendant whether she would take a breath test. Because the record does not disclose whether the "long conversation" about defendant's tattoo occurred during those 15 minutes, "the state failed to establish any subsequent event that 'intervened to break the causal chain' between the violation and the later obtained" breath test. Koch , 267 Or. App. at 334, 341 P.3d 112 (quoting Jarnagin , 351 Or. at 717, 277 P.3d 535 ). Furthermore, because the only intervening information that the trial court found that defendant received was the implied consent warnings that "would have tilted [her] decision towards submitting to the test," we conclude that the fourth Jarnagin factor also weighs in favor of suppression. Swan , 363 Or. at 136, 420 P.3d 9.
5. The use that the state has made of the unwarned statements
We turn to the final factor under Jarnagin "to consider what use the police made of the suppressed statements in obtaining" the breath test results. Koch , 267 Or. App. at 334, 341 P.3d 112. Here, defendant acknowledged that she had been drinking and that she should not have been driving in response to Downey's unlawful questioning following the field sobriety tests. When Downey asked defendant "if she should be driving, if she had been drinking and had dementia and dyslexia," defendant responded, "[p]robably not." Additionally, when asked by Downey how defendant felt "on a scale of one to ten with zero being completely sober and ten being falling down drunk," defendant replied that "she was a two." Later, when Downey interrogated defendant using the alcohol influence interview report at the holding facility, defendant admitted that she had started drinking at 4:00 p.m., that she drank two "vodka squirts," and that she had not eaten since the night before. Finally, the alcohol influence interview report and the breath test were part and parcel of the same DUII protocol; both were administered in the same custodial setting, by the same officer, and were designed to gather evidence of defendant's impaired driving, as admitted in defendant's unlawfully elicited inculpatory statements. Thus, defendant's admissions that she had been drinking and should not have been driving left little of incriminating potential unsaid, other than her precise BAC, *296 and "were inextricably intertwined with [Downey] seeking, and obtaining," the breath test results. Id. at 334, 341 P.3d 112. Based on the totality of the circumstances, we conclude *430 that the fifth factor also tilts the scales in favor of suppression.
B. Causal Chain Conclusion
In sum, although Downey's violation of defendant's Article I, section 12, rights was not the most egregious or flagrant violation, it included, among other things, Downey's repeated unlawful in-custody questioning of defendant using the Oregon State Police alcohol influence interview report. That repeated unlawful custodial interrogation likely affected defendant's decision to take the breath test. Additionally, defendant remained in custody throughout the unlawful interrogation, and only 15 minutes had elapsed from the time Downey unlawfully interrogated defendant using the alcohol influence interview report and when Downey asked defendant whether she would take a breath test. During those 15 minutes, the only subsequent event that occurred was Downey reading defendant the implied consent form that contains several admonitions about the consequences of refusing to take a breath test. Finally, defendant's inculpatory admission that she had been drinking and should not have been driving left little of incriminating potential unsaid, other than her precise BAC, and was inextricably intertwined with Downey seeking, and obtaining, the breath test results. Under those circumstances, we conclude that the state failed to prove that defendant's decision to take the breath test did not derive from the preceding repeated violation of defendant's Article I, section 12, rights.
C. Exigent Circumstances and Search Incident to Arrest
As noted above, the state raised the argument in its supplemental brief that the "police lawfully were permitted to seize [the] breath-alcohol evidence without a warrant based on exigency and as a search incident to arrest." Defendant responds that the state's alternative bases for affirmance under the exigency and search incident to arrest exceptions to the warrant requirement fail "because [the state] does not explain how a questionably permissible search under Article I, section 9, alleviates a violation of a defendant's Article I, section 12, rights." We conclude that *297 the state's undeveloped argument does not provide a sufficient basis for us to affirm.
In making its implied-consent argument in its opening brief, the state makes the same tangential points concerning exigency and search incident to arrest that it did in its brief to the Supreme Court in Swan . We agree with the Supreme Court's observation in Swan that, in its opening brief, "[t]he state does not appear to argue that it is relying on either of those exceptions to the warrant requirement as a basis for obtaining defendant's BAC independently of her implied consent to take a breath test." 363 Or. at 137 n. 9, 420 P.3d 9. To the extent that the state is relying on exigency or search incident to arrest as independent bases for obtaining defendant's BAC in a single paragraph of its supplemental brief, without citation to any legal authority, we decline to consider those grounds for affirmance without a developed argument on those issues. See id . (declining to follow federal precedent on the search incident to arrest exception "under Article I, section 9, without a more fully developed argument on that issue"); Beall Transport Equipment Co. v. Southern Pacific , 186 Or. App. 696, 700 n. 2, 64 P.3d 1193, adh'd to on recons. , 187 Or. App. 472, 68 P.3d 259 (2003) (it is not this court's "function to make or develop a party's argument when that party has not endeavored to do so itself").
III. CONCLUSION
For the reasons explained above, we conclude that the trial court erred when it concluded that the BAC evidence did not derive from the violation of defendant's Article I, section 12, rights. Therefore, the trial court erred in denying defendant's motion to suppress the BAC evidence on that basis. Furthermore, because defendant entered a conditional guilty plea, we do not engage in a harmless error analysis. State v. Dinsmore , 182 Or. App. 505, 519, 49 P.3d 830 (2002). Accordingly, we reverse and remand.
Reversed and remanded.

Article I, section 12, of the Oregon Constitution provides, in part, "No person shall *** be compelled in any criminal prosecution to testify against himself."

ORS 813.010(1)(a) provides that "[a] person commits the offense of driving under the influence of intoxicants if the person drives a vehicle while the person" has "0.08 percent or more by weight of alcohol in the blood of the person as shown by chemical analysis of the breath or blood of the person."

Article I, section 9, provides:
"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The trial court also concluded that defendant voluntarily consented to perform the field sobriety tests and, therefore, Downey could "testify at trial as to his observations as to [defendant's] physical movements on those tests." Defendant does not challenge that determination on appeal.

After the Supreme Court's issuance of Swan , we allowed the parties to submit supplemental briefs in this case.

We do not opine on the basis for the trial court's conclusion that Downey violated defendant's Article I, section 12, rights, because the state does not challenge any aspect of that ruling.

On appeal, the state does not contest the trial court's determination that the violation occurred because defendant did not understand her rights. However, the state argues that Downey's violation of defendant's Article I, section 12, rights was the result of Downey's belief that defendant did not truly lack an understanding of her rights. As the court in Swan noted, an officer's good-faith belief that he stayed within constitutional bounds "has no bearing" on this analysis. 363 Or. at 134 n. 6, 420 P.3d 9.

In Swan , the "Implied Consent Combined Report" was not part of the record, but the court noted that the officer had read defendant the report "in its entirety verbatim" and that the officer had also testified regarding three admonitions contained in the report for refusing to take the breath test-the defendant's loss of driving privileges, a $650 fine, and that the defendant's refusal would be used against him in court. 363 Or. at 135, 420 P.3d 9.