Argued and submitted April 22, 2019, reversed and remanded May 26; on appellant's petition for reconsideration filed June 10, reconsideration allowed by opinion August 18, 2021
See 314 Or App 97, 493 P3d 579 (2021)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JEFFREY CHRISTIAN YAEGER,
*Defendant-Appellant.*

Deschutes County Circuit Court
16CR17252; A164641

492 P3d 668

Defendant challenges her convictions for second-degree encouraging child sexual abuse and unlawful contact with a child. She argues that the trial court erred by denying her motion to suppress statements and derivative evidence that she contends were obtained as a result of post-prison supervision officers interrogating her in compelling and custodial circumstances without giving her *Miranda* warnings, and physical evidence that she contends was obtained by searching her residence and cellphone without her voluntary consent. Defendant also contends that applications for search warrants were based on unlawfully obtained evidence and that evidence discovered as a result of those search warrants should be suppressed. *Held*: Because post-prison supervision officers unlawfully interrogated defendant and searched her residence without her voluntary consent, the trial court erred in not suppressing evidence obtained as a result of those violations. The warrant to search an SD card that was discovered independently of the constitutional violations was supported by probable cause.

Reversed and remanded.

A. Michael Adler, Judge.

Kali Montague, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.

ARMSTRONG, P. J.

Reversed and remanded.

## ARMSTRONG, P. J.

Defendant was convicted, on a conditional guilty plea, of three counts of second-degree encouraging child sex abuse, ORS 163.686, and two counts of unlawful contact with a child, ORS 163.479. On appeal, she argues that the trial court erred by denying her motion to suppress statements and derivative evidence that she contends were obtained as a result of post-prison supervision officers interrogating her in compelling and custodial circumstances without giving her *Miranda* warnings, and physical evidence that she contends was obtained by searching her residence and cellphone without her voluntary consent. Defendant also contends that applications for search warrants were based on unlawfully obtained evidence and that evidence discovered as a result of those search warrants should be suppressed. As we explain, some of defendant's arguments are well taken and some are not; the trial court erred in denying the motion to suppress as to some of the evidence. We reverse and remand.

## I.   BACKGROUND

We review the trial court's denial of a motion to suppress for legal error and are bound by the court's express factual findings if evidence in the record supports them. *State v. Taylor*, 296 Or App 278, 279, 438 P3d 419 (2019). We state the facts accordingly.

After serving a prison term for second-degree online sexual corruption of a child, ORS 163.432, defendant was released, and the Board of Parole and Post-Prison Supervision (the board) designated her a predatory sex offender. *See former* ORS 181.585 (2011), *renumbered as* ORS 181.838 (2013), *repealed by* Or Laws 2015, ch 820, § 36. Her predatory-sex-offender status required public notice, and the notice indicated, among other things, that defendant targets six-year-old to 17-year-old females by posing as a modeling agent and contacting them over the internet. Her sex-offender status made her subject to the crime of unlawful contact with a child, ORS 163.479, if she knowingly contacted a child for the purpose of arousing and satisfying her sexual desires.

The board also imposed post-prison supervision (PPS) conditions. She was prohibited from having access to cellphones, computers, and the internet, and from having contact with children. One condition imposed on defendant was that she "promptly and truthfully answer all reasonable inquiries" by a county community corrections agency. Defendant was subject to "home visits," which meant that defendant had to "[p]ermit the supervising officer to visit the offender or the offender's residence or work site, and to conduct a walk-through" of defendant's residence. Another condition was that defendant "[c]onsent to the search of person, vehicle or premises" if the "supervising officer has reasonable grounds to believe that evidence of a violation will be found." Carpenter, employed by Deschutes County's PPS office, was the officer responsible for supervising defendant.

Another PPS officer, McNaughton, received kites by one of her supervisees, Dunaway. Dunaway's kites reported that defendant had a flip phone and a smartphone that contained pornography and pictures of females appearing to be underage. Dunaway also reported that defendant had been in "contact via phone and text messages with females [she] met" online and that defendant's SD card containing pornography was missing. Dunaway accused defendant of making a "rape kit" and he hoped that the information he was providing to McNaughton would help "get a dangerous predator off the streets." McNaughton passed this information on to Carpenter on July 28.

On July 29, at about 9:15 a.m., Carpenter and McNaughton—wearing "duty gear"—attempted to find defendant at her Tom Tom Motel residence for a "home visit." Carpenter characterized a "home visit" as a visit to a supervisee's home under their supervision conditions, and, if there is reasonable belief that there will be a new crime or a PPS violation, PPS officers have the authority to tell the supervisee that they will be conducting a search. Carpenter's concern, which she believed "was more than likely true," was that "there were victims" because defendant had been convicted before her supervision of sexual offenses concerning minors. Carpenter did not want to rely on hearsay and

wanted to give defendant an opportunity to be honest and "tell [Carpenter herself]" about the accusations.

While there, the PPS officers learned that defendant was at the dentist. The officers also learned that a resident of the motel, Mitchell, had found an SD card that contained pornography and pictures of defendant. Mitchell turned the SD card over to a motel worker, Trenholm, who in turn handed the card over to the motel's manager, Steele. The PPS officers were also told that defendant had been seen "hiding things over in the bushes" on the motel grounds, and they searched a "little bit" before deciding that there was too much area to search and that they would go pick up defendant at the dentist.

Carpenter and McNaughton arrived at defendant's dentist's office around 9:45 a.m. and approached defendant as she was walking outside of the dentist's office. The officers told defendant that they would be taking her to the Tom Tom Motel to conduct a home visit. Defendant did not appear to be under the influence of anything, but, before the officers and defendant left, they went into the dentist's office, and Carpenter asked for a letter from the dentist indicating that defendant had clearance to be admitted to jail. While driving to the motel, with defendant sitting in the back of the car, Carpenter asked defendant if she possessed a cellphone. She replied that she did not. Carpenter then told defendant that she should be truthful, and defendant swore that she did not have cellphones because she knew she was not supposed to have them.

Neither Carpenter nor McNaughton *Mirandized* defendant. It was the policy and practice of the county's probation and post-prison supervision office that supervisees on probation are to be given *Miranda* warnings when supervising officers are going to make an arrest but, if a supervisee is on post-prison supervision, supervising officers are not required to, and do not, provide *Miranda* warnings.

When defendant and the PPS officers arrived at the Tom Tom Motel, the officers told defendant that they believed that she had two cellphones, and, after defendant repeatedly denied that she had cellphones, Carpenter "let [defendant] know that [the PPS officers] would be conducting

a search" and that "[a]t any time [defendant] was able to tell [the PPS officers] to stop the search."[1]

The PPS officers started searching. During the search, the PPS officers found some things: a child-sized homemade swimsuit under defendant's pillow; a black book that included a list of girls' names, ages (13 to 16 years old), hair color, eye color, weight, breast size, and email addresses; and handwritten stories about sexually abusing children. The officers also found what they believed was a "rape kit": 100 feet of rope and an emergency blanket. They also discovered a charger and receipts for a phone.

Initially, the officers did not find cellphones, and Carpenter told defendant, "Look, I really want you to be honest with me and it is part of your conditions. So be honest with me if you have cell phones." Carpenter told defendant that there was a lot of property to search at the motel and let defendant know that she would call in either the Bend police or the sheriff's office to help with the search, because it "could literally take hours and hours for the two of us to do that." Carpenter let defendant know that she would prefer defendant to be truthful with her. Defendant "knew a search was coming" and that she would be arrested if she refused.

At that point, defendant said, "[Y]es, I, I do have a cell phone." Defendant led the PPS officers out to some ivy bushes on the motel grounds and grabbed a flip phone. Carpenter asked defendant what was on the phone, and defendant replied that there was pornography on the phone of young girls, but "all of age." Defendant gave the PPS officers permission to search the flip phone. The officers discovered a picture of a six-year-old girl used as the phone's wallpaper. They then asked about another phone, a smartphone. Defendant went and retrieved the smartphone out of the ivy bushes. There were numerous pictures on one of the phones that appeared to be of "very young minor females."

---

[1] This event was also described in McNaughton's written report as Carpenter "direct[ing defendant] to submit to a search of [her] room and the outbuilding [she] stores some items in." McNaughton also testified that Carpenter told defendant that "they were going to do a search, and asked for [her] consent and [she] gave it."

The PPS officers did not place defendant under arrest but brought her to the PPS office because they wanted to give defendant an opportunity to elaborate on what the officers had found and the things that defendant had admitted. At the office, Carpenter discussed with defendant the images discovered on the phone and about the names of the females that were written in the black book. Carpenter asked to see the images on the phone, and defendant provided her the passcode. Before looking at the phone, Carpenter asked defendant if they would find any child pornography or any minors, and defendant replied "no" and that all were of age. Carpenter saw child pornography on defendant's phone and asked defendant about it. Carpenter said, after defendant inquired if she could do community service instead of jail time, "[W]e'll talk about your options, but for right now we need to know who have you been contacting, what have you been doing? I need you to be honest with me." Defendant admitted to viewing a "Sex Kittens" website, which contains child pornography; having Facebook and GoFundMe accounts; and that she had set up a fake modeling agency and been contacting minors in that capacity.

Defendant also told Carpenter and McNaughton that the SD card was missing without being asked about it. The PPS officers asked her about the SD card—what it looked like and where she thought that she had lost it. Defendant said that she had lost the SD card in the area where it had been found by Mitchell.

Carpenter arrested defendant. There was no recollection by Carpenter that defendant was advised of her *Miranda* rights as she was arrested.

Steele brought the SD card to the supervision office later that day.

Carpenter visited defendant a week later in jail and asked defendant to consent to having Multnomah County law enforcement forensically analyze her phones. Defendant signed a form agreeing to permit that. At that point, defendant had not been *Mirandized*. Local law enforcement, however, did not hear back from Multnomah County law enforcement regarding anything that they may have discovered on the phones.

Carpenter provided Detective Murphy, assigned by the Bend Police Department to criminally investigate defendant, with evidence obtained against defendant. About three weeks after Carpenter had arrested defendant, Murphy questioned defendant in jail, providing *Miranda* warnings before doing so. Murphy showed defendant the SD card provided to him by Carpenter and asked defendant if it was hers. She responded that she was not sure if it was hers but acknowledged that it resembled her SD card. Defendant said that she had hidden her SD card in a "secret spot" and that somebody had stolen it from the place that she had hidden it. She did not consent to having the SD card searched. The detective asked defendant why she would remove the SD card, because doing so compromises a phone's capabilities. Defendant responded that she just decided to do it and that she knew many others who did the same thing. Defendant refused to continue with Murphy's questioning.

Murphy applied for a search warrant to search the SD card that had been turned over to Carpenter and the personal papers and notebooks that were discovered in defendant's motel room on July 29. In his affidavit for the search warrant application, Murphy recited much of what had occurred on July 29, as told to him by Carpenter. The search warrant was granted. Murphy thereafter analyzed the SD card, in which he found "images and videos of suspected child porn" and "images [of] young girls of various ages, from prepubescent to teenagers." The images found on the SD card were the basis for the second-degree encouraging child sexual abuse charges. The paperwork included girls' names, birthdates, email addresses, and phone numbers. Based on that information, Murphy requested and received a second search warrant for defendant's Gmail and Instagram accounts. Two other search warrants were issued, both based on what was discovered on the SD card. Defendant was ultimately indicted with multiple counts of second-degree encouraging child sexual abuse and unlawful contact with a child.

Defendant filed a motion to suppress evidence. Defendant argued in the motion that the search of defendant's room and the seizure of items discovered in it, as well as the search of defendant's cellphone, were obtained without

defendant's voluntary consent, in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. Defendant also argued in the written motion that she involuntarily made statements incriminating herself because she was in compelling circumstances or in custody during the July 29 encounter with Carpenter and McNaughton. Consequently, in her view, her rights against self-incrimination under Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution were violated when the PPS officers failed to *Mirandize* her. Defendant also argued that facts in the affidavit for the initial search warrant were discovered unlawfully, and without them, there was not sufficient evidence to support probable cause to issue the search warrant for the SD card and other evidence.

A hearing on the suppression motion was held, and Carpenter, McNaughton, and Murphy testified to the facts described above. At the conclusion of the hearing, defendant argued below that she had not consented to a search. Further, defendant emphasized, relying on *State v. Heise-Fay*, 274 Or App 196, 360 P3d 615 (2015), that she was under compelling circumstances when the PPS officers exerted pressure on her to tell them the truth. Moreover, she contended that the pressure was even greater when the officers threatened to bring in local law enforcement. In her view, *Miranda* warnings should have been given at the dental office, at the Tom Tom Motel, and at the PPS office. When the court pointed out that defendant was on PPS, defendant responded that the parties were litigating a criminal offense, not a PPS violation, and that constitutional protections therefore apply. Defendant argued that there was no case law that carves out constitutional protections for persons subject to PPS, and that she had constitutional protections guarding her privacy interests when the PPS officers directed defendant to disclose the location of the cellphones. Defendant also argued that the probable cause for the search warrant of the SD card depended mainly on the unlawfully obtained statements and evidence from July 29. Additionally, defendant asserted that Murphy's interrogation was based on tainted evidence and that the things defendant had told him should be excluded.

The state responded that defendant was some-one who was on post-prison supervision, a convicted sex offender, and designated a predatory sex offender, which gave, under Oregon law and United States Supreme Court case law, the PPS officers authority for home visits and exe-cuting searches. In the state's view, the encounter on July 29 was a matter of cordial discussion, permitted by the terms of defendant's PPS conditions. Further, the state argued that defendant, as a person on post-prison supervision, had limited constitutional rights. And, in any event, the state asserted that at no time did defendant say that she did not want to talk or cooperate with the search.

The trial court ruled as follows:

"But the home visit, the home visit and subsequent search conducted by the Parole and Probation officers McNaughton and Carpenter was authorized. The Defendant was on post-prison supervision and parole officers, Parole and Probation Officers McNaughton and Carpenter had reasonable grounds to believe that, based on information that they had received, that the Defendant had violated the conditions of [her] post-prison supervision, and went to the Defendant's home. In this case it was the Tom-Tom motel, but it was essentially [her] home at the time, where [she] was staying, and contacted [her]. And quite frankly, I find that the, the statements made by [defendant] were volun-tary and the, the search that was conducted was pursuant to [her] consent. And I really don't find there was really any evidence to the contrary in this hearing.

"* * * * *

"There was, then there were search warrants that were obtained later. And the Defense argument was really, essentially, that the search warrants were invalid because the statements made by the Defendant were not, were not voluntary and were, were unlawfully obtained. And because I'm finding that the statements were lawfully obtained and were voluntary and were, were pursuant to valid consent, the motion to suppress the searches through the later search warrants, that, those, the motion to sup-press addressing those search warrants is denied as well.

"Another issue that was raised, and it's really sort of the same issue but a different, a different aspect of the same

issue. The Defense argued that the Defendant should have been advised of [her] *Miranda* rights. But quite frankly the law doesn't support that. The Defendant was on post-prison supervision as a, as a sex offender, and the statute governing that does not require *Miranda* rights for Parole and Probation officers interviewing the person they're supervising after obtaining information that gives them reasonable grounds to believe that the violation, that [she] had violated the terms of [her] post-prison supervision. They didn't need, they didn't need to advise [her] of [her] *Miranda* rights. They admitted that they did not and I find that they did not have to."

Defendant entered a conditional guilty plea, and she timely appealed.

## II.  ANALYSIS

Before we embark on our discussion of the focus of the parties' arguments concerning Article I, section 9, and Article I, section 12, we first address the trial court's ruling that *Miranda* warnings were not required because a statute concerning PPS conditions for sex offenders made it unnecessary to provide *Miranda* warnings to defendant. The court also referenced, and agreed with, the policy of the county's PPS office that its officers were not required to advise persons on PPS of their *Miranda* rights.

On appeal, the state does not defend that ruling as a basis for denying defendant's suppression motion by either pointing to any statute that excuses advising persons subject to PPS of their *Miranda* rights or otherwise providing a basis for what appears to be a *per se* policy that *Miranda* is not required for people on PPS. It is correct that the state does not undertake to defend the ruling on that basis. Constitutional protections apply to people on post-prison supervision. We have plainly said that, "[e]xcept as limited by [a person's] conditions of parole, defendant had the same rights upon parole as any other citizen." *State v. Brown*, 110 Or App 604, 608, 825 P2d 282 (1992); *State v. Houston*, 110 Or App 19, 24, 821 P2d 1093 (1991) (noting that, for statements made to the defendant's parole officer, under "the Oregon Constitution, [*Miranda*] warnings are required when a defendant is in full custody or another setting that

judges would and officers should recognize to be compelling"
(internal quotation marks omitted)).

It is also important to note that defendant's PPS
conditions did not *require* defendant to submit to the demands
of PPS officers. *Cf. State v. Tennant*, 310 Or App 70, 74, 483
P3d 1226 (2021) ("[T]he state does not contend—***, prop-
erly so—that defendant was required to consent to a search
by virtue of his probationary status."); *State v. Davis*, 133
Or App 467, 474, 891 P2d 1373, *rev den*, 321 Or 429 (1995)
(general conditions of probation do not constitute a "waiver
of the probationer's Article I, section 9, rights, the proba-
tioner is entitled to refuse to allow the search, and must be
given a reasonable opportunity to do so"). Rather, the con-
ditions provide that the failure to comply with those condi-
tions results in a PPS violation, which can result in a sanc-
tion or incarceration. Further, we fail to find a distinction in
Oregon law between the rights afforded to people on proba-
tion and people on PPS. A person on probation or PPS who
invokes a constitutional right may subject him- or herself to
a PPS violation, but that does not obviate any constitutional
right that that person may have. To the extent that the trial
court agreed with the county's PPS office policy and prac-
tices that were based on a contrary understanding, the court
erred.

A.   *Article I, section 12*

The trial court also ruled that defendant's state-
ments were voluntary, and we turn to defendant's argu-
ment that her statements should have been suppressed
under Article I, section 12, *viz.*, defendant's statements were
unlawfully obtained because she was in compelling circum-
stances when the officers interrogated her, and the PPS offi-
cers failed to advise her of her *Miranda* rights.[2]

Under Article I, section 12, of the Oregon Consti-
tution, "No person shall be *** compelled in any criminal

_____

[2] We need not reach defendant's argument that, under *State v. Gaither*, 196
Or App 131, 100 P3d 768 (2004), *rev den*, 338 Or 488 (2005), her rights against
self-incrimination were violated because she was forced to choose between violat-
ing the conditions of her supervision and giving up her right to not incriminate
herself.

prosecution to testify against himself."[3] That constitutional right against self-incrimination is protected if law enforcement officers "provide *Miranda* warnings to a suspect before interrogating that suspect if the suspect is in full custody or compelling circumstances." *State v. Phillips*, 302 Or App 618, 623, 459 P3d 909, *rev den*, 366 Or 552 (2020) (internal quotation marks removed). That is, *Miranda* warnings are required if (1) the suspect is in full custody or compelling circumstances and (2) there is an interrogation. It is the state's burden to prove that a defendant's statements were made voluntarily. *State v. Roble-Baker*, 340 Or 631, 639, 136 P3d 22 (2006).

A person is in compelling circumstances when—considering the totality of circumstances—the circumstances indicate that a reasonable person would believe that they are being compelled to answer an officer's questions. *State v. Dunlap*, 215 Or App 46, 57, 168 P3d 295 (2007). Such a circumstance occurs in a police-dominated atmosphere. *Roble-Baker*, 340 Or at 641 (explaining that the "overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract"). And, the nonexclusive facts used to make that determination include "(1) the location of the encounter; (2) the length of the encounter; (3) the amount of pressure exerted on the defendant, including whether an officer has used evidence of guilt in a coercive manner; and (4) the defendant's ability to terminate the encounter." *Heise-Fay*, 274 Or App at 202 (citing *Roble-Baker*, 340 Or at 640-41). "We also examine the number of officers and police cars at the scene, the demeanor of the investigating officer, and the use of physical force or confinement during questioning." *Id.*

For purposes of Article I, section 12, "interrogation" means "police statements or conduct 'likely to elicit some type of incriminating response.'" *State v. Shevyakov*, 311 Or App 82, 87, 489 P3d 580 (2021) (quoting *State v. Schmidtke,* 290 Or App 880, 885, 417 P3d 563 (2018)). "More particularly,

---

[3] Defendant also asserts that her statements were unlawfully obtained under the Fifth Amendment to the United State Constitution. Because we conclude that defendant's right against self-incrimination was violated under Article I, section 12, we do not reach that argument.

because Article I, section 12, concerns the right not to be compelled to testify, interrogation means statements or conduct likely to elicit (1) an incriminating response that is (2) testimonial; and (3) 'that the prosecution may later seek to introduce at trial.'" *Id*. (quoting *State v. Scott*, 343 Or 195, 203, 166 P3d 528 (2007)).

Defendant asserts that the PPS officers violated her rights under Article I, section 12, and the Fifth Amendment because the un-*Mirandized* statements that she made throughout the day on July 29 were made involuntarily. That is because she was in compelling circumstances throughout the encounter, and the questions the PPS officers posed to her were likely to elicit some type of incriminating response. The state, acknowledging that it conceded below that defendant was in a custodial setting on July 29, responds that the PPS officers did not interrogate defendant because the officers were only investigating a PPS violation, and the questions that they asked defendant were about a PPS violation, not a crime. In the state's view, none of the questions about defendant's cellphones constituted interrogation because interrogation consists of questioning or conduct that law enforcement should know is reasonably likely to elicit an incriminating response.

Because the state concedes that defendant was either in compelling circumstances or in a custodial setting for the July 29 encounter—and we agree with and accept the concession—the Article I, section 12, arguments reduce to whether the PPS officers interrogated defendant. We conclude that they did.

Carpenter and McNaughton had been alerted that defendant might have been committing crimes against children. Although it is true that the PPS officers were fulfilling their obligation to investigate a post-prison supervision violation, Carpenter testified that the impetus for going to the motel and then retrieving defendant at the dentist's office was that Carpenter believed that it was "more likely than not" that there were "*victims.*" It is true that the PPS officers did not have direct evidence from Dunaway that defendant had images of child pornography on her phone (informants had related that they viewed pornography and images of

underage girls on defendant's phone, but not child pornography). However, child pornography was not the PPS officers' sole concern, and, even if we were to accept the state's position that the PPS officers had no reason to believe that they would discover child pornography on defendant's cellphones—a proposition of which we are skeptical given the state's arguments concerning probable cause for the search warrants—the PPS officers had reason to believe that other crimes would be discovered on defendant's phone. That is, given defendant's criminal history (convicted of second-degree online corruption of a child), her designation as a predatory sex offender who targets children online, and the information Carpenter and McNaughton had learned from Dunaway, *viz*., that defendant was assembling a "rape kit," was texting and messaging females she had met on online dating sites, and that there were images of underage females on the defendant's phone, it was reasonable for Carpenter and McNaughton to suspect that defendant had at least committed the crime for which she was charged, unlawful contact of a minor, and that evidence of those crimes would be discovered on defendant's cellphones. The record does not support the state's contention that the PPS officers were merely investigating a PPS violation.[4]

Likewise, we reject the state's argument that defendant's answers to the PPS officers' questions were neither inculpatory nor exculpatory, and thus not incriminating responses, because "at most," defendant's admission of cellphone possession or disclosing the location of a cellphone would only subject her to being found in violation of a PPS violation, which is not a crime. As we have explained, the

---

[4] Two other arguments by the state are unavailing. The state argues that there is nothing in the record that suggests that the PPS officers were *trying* to elicit an incriminating response. Evidence of an officer's subjective intent, however, is not required. *Rhode Island v. Innis*, 446 US 291, 301, 100 S Ct 1682, 64 L Ed 2d 297 (1980) (stating that "*Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police"). The state also contends that the questions about cellphones were analogous to routine booking questions, and therefore not subject to *Miranda*. *See State v. Moeller*, 229 Or App 306, 312, 211 P3d 364 (2009) (holding that questions during a detainee's medical condition while in police custody served an administrative purpose and did not constitute interrogation). We reject without discussion that the PPS officers' questions served an administrative purpose.

PPS officers were not merely conducting a PPS-violation investigation—they were also conducting a criminal investigation. A "yes" response to the officers' questions would have revealed whether or not defendant was in possession of an item that was used for a crime that the officers believed that defendant had committed. And that is something that a prosecutor could "later *** seek to introduce at trial." *Shevyakov*, 311 Or App at 87. It is evident that admitting to possession of the *means* to commit a crime is inculpatory. Likewise, a denial to the officers' questions about cellphone possession could also be incriminating insofar as a denial that later proves to be untrue can be used to show consciousness of guilt. *See State v. Simmons*, 279 Or App 756, 767, 379 P3d 580, *rev den*, 360 Or 697 (2016) (reasoning that "a rational juror could infer that defendant's statements to investigators acknowledged his knowledge of the circumstances of the [crime], and that his refusal to divulge those circumstances manifested a consciousness of guilt").

Consequently, the PPS officers, in the car and at the motel, interrogated defendant because the questions that they asked were likely to elicit an incriminating response. Because those questions were asked while in compelling circumstances, the PPS officers were required to advise defendant of her *Miranda* rights. And, because the officers did not do that, defendant's right against self-incrimination under Article I, section 12, was violated, and the trial court should have suppressed the statements that she made during the car ride and at the motel.[5]

Defendant also argues that statements she made at the PPS office, like those that were made in the car ride and at the motel, were the product of an unlawful interrogation. The PPS officers, defendant asserts, confronted defendant with the evidence that they had gathered at the motel and questioned her about possessing child pornography and the details of her contacts with children. The state

---

[5] Defendant argues that there was a *Miranda* violation when Carpenter obtained defendant's consent to have her cellphone forensically analyzed, which never occurred. Defendant does not identify any statement that defendant made during that encounter that was incriminating, and we reject her argument that there was a *Miranda* violation.

responds that the record entitled the trial court to conclude that statements defendant made were not made in response to any questions or interrogation from the PPS officers. That is because Carpenter testified that the PPS officers only brought defendant to their office to give defendant an "opportunity" to tell the officers more about the plan and the evidence that they had collected. If defendant's statements were not elicited by questions or interrogation, then, the state argues, *Miranda* warnings were not required. In particular, the state points to the fact that Carpenter testified that defendant "voluntarily" gave the officers the information that the SD card was missing and that she had lost it in the area where Mitchell found it.

We disagree that the record supports the inference that the PPS officers did not interrogate defendant at the PPS office. The officers asked questions designed to elicit incriminating evidence. The PPS officers "talked" to defendant about what would be on the cellphones; "asked" defendant specifically whether the phones would contain child pornography; and "ask[ed]" defendant about the child pornography that was on the phones. Further, the officers brought defendant to the office so that defendant could explain the statements and evidence that had been discovered earlier. In those circumstances, that can only be construed as confronting defendant with evidence that they already had against her. That is interrogation. *Schmidtke*, 290 Or App at 887 ("Confronting a detainee with the evidence against him or her can constitute interrogation."). And, that defendant "voluntarily" told the officers about the SD card and where it was missing does not mean that that statement was voluntarily given for the purpose of Article I, section 12, when she was in compelling circumstances and in the midst of questioning by the officers as they confronted her with the physical evidence of the cellphones that they had discovered.

In sum, the trial court erred in concluding that defendant's statements were voluntary and that therefore *Miranda* warnings were not required. There were *Miranda* violations, and defendant's statements should have been suppressed.

B.    *Derivative Evidence from the* Miranda *Violations*

Defendant also contends that the discovery of the cellphones in the area behind the Tom Tom Motel and her consent to search them were derivative of the *Miranda* violations and should be suppressed. Defendant relies on the rule, articulated in *State v. Jarnagin*, 351 Or 703, 716, 277 P3d 535 (2012), that, "because the failure to give *Miranda* warnings, when required, is itself a constitutional violation, the remedy for that violation extends not only to a defendant's unwarned responses to an officer's questions but also to the physical and testimonial evidence that is the product of that violation." *See also State v. Vondehn*, 348 Or 462, 476, 236 P3d 691 (2010) (evidence obtained as the product of a *Miranda* violation applies to physical evidence). Under *Jarnagin*, as applied here, we look at the nature of the *Miranda* violation; the amount of time between the violation and the discovery of the cellphones and defendant's consent to search them; whether the suspect remained in compelling circumstances between the time of the violation and the discovery of the cellphones and the consent to search them; subsequent events that may have dissipated the taint of the earlier violation; and the use that the PPS officers made of the unwarned statements. 351 Or at 716.

In defendant's view, the discovery of the cellphones and her consent to search are "intrinsically intertwined" with the unwarned statements that she made. That is, they were close in time, she remained in compelling circumstances, and there were no intervening circumstances that could have dissipated the taint of the violation. The state answers that the nature of the violation was not flagrant, *see, e.g.*, *State v. Koch*, 267 Or App 322, 332, 341 P3d 112 (2014) (officers flagrantly violated *Miranda* by continuing to question a defendant after the defendant unequivocally invoked his right to counsel), and that there was never a *Miranda* violation to begin with.

We agree with defendant that the discovery of the cellphones and the consent to search them were the product of the aforementioned *Miranda* violation. Immediately after defendant relented to the PPS officers' questions and admitted that she did possess a cellphone, she led the officer to

the location of the flip phone. Likewise, the discovery of the smartphone occurred immediately after the officers asked her about it. In both cases, the discoveries were related to the unlawful interrogation regarding the phones' existence. Additionally, the discoveries of the phones were near contemporaneous with the *Miranda* violation, defendant remained in compelling circumstances, and there was no intervening circumstance. Those factors outweigh whatever degree of flagrancy the violation may have lacked (we need not decide whether the violations were flagrant).

## C.   *Belated* Miranda *Warnings*

As to defendant's statements about the SD card to Murphy while she was in jail—*viz.*, the SD card resembled the one she had hidden in a secret spot—which were preceded by *Miranda* and occurred about three weeks after the July 29 encounter with the PPS officers, defendant makes two arguments: (1) in the vein of the derivate-evidence analysis explained in *Jarnagin*, statements she made to Murphy were the product of the earlier *Miranda* violations and were therefore unlawfully obtained derivative evidence; and (2) under *Vondehn*, 348 Or at 480-82 (holding that belated *Miranda* warning may not "accurately and effectively" inform a suspect of his or her rights under certain circumstances), Murphy's interrogation was a continuation of the earlier and unlawful interrogations, and the *Miranda* warnings were not effective.

As for defendant's *Vondehn* argument, it is not preserved. Although the state does not contend in its briefing that defendant failed to preserve her argument, we nevertheless have an "independent obligation to determine whether an argument advanced on appeal was preserved at trial." *Vokoun v. City of Lake Oswego*, 189 Or App 499, 508, 76 P3d 677 (2003), *rev den*, 336 Or 406 (2004) (citing *State v. Wyatt*, 331 Or 335, 344-46, 15 P3d 22 (2000)). We have reviewed the record, and we have not found that defendant argued to the trial court that, despite Murphy's *Miranda* warning, defendant was not accurately and effectively apprised of her right against self-incrimination.

Additionally, applying the factors set out in *Vondehn* is the proper analytical framework for assessing whether

defendant's statements were voluntary after being *Mirandized*, and we therefore do not consider defendant's alternative argument that her statements were the tainted product of the *Miranda* violations. *See Jarnagin*, 351 Or 703 (applying a derivative evidence analysis for statements made under circumstances that were neither compelling nor custodial and after a *Miranda* violation and applying an analysis using the factors adopted from *Missouri v. Seibert*, 542 US 600, 124 S Ct 2601, 159 L Ed 2d 643 (2004), for statements that were made after *Miranda* was given). Consequently, we conclude that the trial court did not err in admitting defendant's statements to Murphy about the SD card.

D. *Article I, Section 9; Search of Defendant's Residence*

Defendant argues that the trial court erred in not suppressing the physical evidence discovered in defendant's residence. In defendant's view, the state failed to meet its burden to establish that she voluntarily consented to the search. The state responds by pointing out that the PPS officers asked for, and received, defendant's consent and that the officers gave defendant a reasonable opportunity to refuse the search.

A search without a warrant is *per se* unreasonable and presumptively unlawful under Article I, section 9, unless the search is permissible under an established and limited exception to the warrant requirement. *State v. Bonilla*, 358 Or 475, 480, 366 P3d 331 (2015). Consent is such an exception to the warrant requirement. *Id.* (noting that "consent relinquishes a person's privacy interest in property so that there is no unlawful intrusion under Article I, section 9"). When the state advances "consent" as an exception to the constitutional warrant requirement, it must establish— that is, it is the state's burden to prove—by a preponderance of the evidence that, among other things, the person subjected to the warrantless search voluntarily consented to the search, rather than simply acquiesced to authority.[6]

---

[6] "The state has the burden of proof and persuasion to establish, by a preponderance of the evidence, four things: (1) that a person with the authority to do so, (2) voluntarily consented to the search, rather than simply acquiesced to authority. Then, the state must establish (3) the scope of consent given, and finally, (4) that the search conducted did not exceed the scope of the consent given." *Tennant*, 310 Or App at 75 (footnote omitted). The first, third, and fourth things the state needs to establish are not at issue in this case.

*Tennant*, 310 Or App at 75. It also is important to note that a supervision requirement under which the supervisee must consent to a search when a supervising officer has reasonable grounds to believe that a violation has occurred "is not self-executing." *Dunlap*, 215 Or App at 54. Rather, the supervisee has the choice of refusing consent and putting herself at risk of being subject to a violation for not consenting. If, however, a supervisee has refused consent, the supervising officer is not justified by the mere fact of the PPS condition in searching the supervisee's home. *Id*.

With respect to the state's burden, the state "first must establish that defendant's 'consent' was, in fact, consent, and 'not mere acquiescence to a thinly veiled demand.'" *Tennant*, 310 Or App at 75 (quoting *State v. Brock*, 254 Or App 273, 278-79, 295 P3d 89 (2012)). Acquiescence—which is not consent—occurs when an individual is either not provided "a reasonable opportunity to choose to consent" or when circumstances or words make clear that "a search will occur regardless of whether consent is given." *State v. Berg*, 223 Or App 387, 392, 196 P3d 547 (2008), *adh'd to as modified on recons*, 228 Or App 754, 208 P3d 1006, *rev den*, 346 Or 361 (2009). The state's argument in this case posits that consent was asked for and voluntarily given and that there was acquiescence by defendant because the officers gave defendant a reasonable opportunity to choose to consent when the officers indicated to defendant that she could stop the search at any time. For defendant's part, she argues that any consent asserted by the state was mere acquiescence because the PPS officers' conduct and words made clear that a search was inevitable.

To answer that question—"whether a particular police-citizen interaction amounts to consent, versus mere acquiescence"—we look to the totality of the circumstances that were present during the encounter. *Tennant*, 310 Or App at 76. We have identified certain circumstances as relevant to that analysis. Particularly important is an officer's language concerning consent, although it is not dispositive. And, we have indicated that an officer's language that is framed as a question regarding a defendant's consent "may nevertheless be 'confrontational in the context of the

interaction.'" *Id*. (quoting *State v. Leiby*, 293 Or App 293, 298, 427 P3d 1141 (2018)).

Also, when we assess consent versus mere acquiescence, we consider the situation from the perspective of the person being asked for consent, not the police officer seeking consent. *Tennant*, 310 Or App at 76 (citing *State v. Briggs*, 257 Or App 738, 742-43, 307 P3d 564, *rev den*, 354 Or 386 (2013) ("When those words do not provide the listener with a reasonable opportunity to choose to consent, or when those words leave the listener with the impression that a search is inevitable, absent strong countervailing factors, we have consistently found acquiescence rather than consent."). "The impression that a search is inevitable can come from what is said, the manner in which it is said, the situational context of the encounter, as well as what is left unsaid." *Tennant*, 310 Or App at 76. Further, "[a]lthough we have never held it to be explicitly required, in assessing whether the state has met that burden" of showing that a defendant was given a reasonable opportunity to refuse a request to consent to a search, "we have given considerable weight to whether the officer 'correctly informed defendant that he could refuse to consent to a search, while noting that such a refusal could subject him to arrest for a probation violation.'" *Id*. (quoting *State v. Hiner*, 240 Or App 175, 182, 246 P3d 35 (2010)).

For the following reasons, we conclude that the state did not meet its burden of establishing that defendant voluntarily consented to a search of her motel room. Rather than waiting for defendant at her motel room or returning at a time when the officers knew she would return, the officers picked her up at the dentist office in place of defendant's friend and, on the way to the motel, confronted her with their belief that she was in possession of a cellphone and told her that they would be conducting a home visit (defendant's supervision conditions permitted PPS officers to visit her home and walk through common areas or defendant's rooms). That situation set the stage for when the officers "directed" defendant to submit to a search or "told" her that they were going to search her motel room. From defendant's viewpoint, the officers' subsequent request for consent was merely a veil for the officers' demand to search. Any "consent" given by defendant was

mere acquiescence because, from her perspective, the PPS officers had indicated that a search was inevitable.

Moreover, defendant was not afforded a reasonable opportunity to refuse the search. *See Tennant*, 310 Or App at 77 ("[I]n the context of a request for consent by a probationer, we have held that, to meet its burden, the state must show that the probationer was given 'a reasonable opportunity' to refuse." (Quoting *Davis*, 133 Or App at 474.)). Although defendant was informed that she could stop the PPS officers' search "at any time," that opportunity to "refuse consent" was merely an opportunity to *stop* a search that would already be underway. Stopping something that is already happening is not the same as providing permission for something to happen. That is, obtaining consent for a search contemplates that consent is given before a search begins, and if the search has begun, withdrawing consent is not equivalent to having provided it in the first instance. *Hiner*, on which the state relies, is not to the contrary.

There, the deputy correctly informed the defendant that he could refuse to consent to a search, while noting that such a refusal could subject him to arrest for a probation violation. 240 Or App at 178. But the deputy told the defendant that the defendant could refuse the search and clearly set out the alternatives of the probation condition: consent to a search based on reasonable suspicion or violate parole. *Id*. That is different from what happened here.

E.   *Search Warrants*

Defendant contends that the first search warrant— to obtain evidence from the SD card and defendant's personal papers discovered in her motel room—relied on evidence from the encounter on July 29 and that, without that evidence, there was not probable cause to search the contents of the SD card and defendant's personal paperwork. The state responds that, if information in the affidavits is deemed by this court to have been unlawfully obtained, defendant is only entitled to a remand for further litigation about the search warrant's validity. Alternatively, the state asserts that the information that remains in the affidavit, independent of the unlawfully obtained evidence, was sufficient to support the issuance of the warrant.

To begin with, the state is incorrect that the validity of the search warrants is an issue to be decided by the trial court on remand. In *State v. Gardner*, 263 Or App 309, 313, 327 P3d 1169, *rev den*, 356 Or 400 (2014), we said that, "when an application includes constitutionally tainted information, the proper remedy is for the reviewing court to excise all the tainted information from the application and determine whether the remaining information in the affidavit is sufficient to establish probable cause." We do that here—excise the tainted evidence from Murphy's affidavit and assess the remaining information to assess whether probable cause existed. Consequently, all of the evidence obtained on July 29 by the PPS officers is excised. However, we do consider evidence that was not obtained unlawfully, *viz.*, the SD card, statements made to Murphy in jail, and additional evidence that Murphy included in the application.

"Probable cause exists when the facts set out in the warrant application would lead a reasonable person to believe that seizeable things will probably be found in the location to be searched." *Id*. (citing *State v. Henderson*, 341 Or 219, 225, 142 P3d 58 (2006)). "Our task is 'to determine, as a matter of law, whether [the affidavit] permits a conclusion by a neutral and detached magistrate that the items specified in the warrant will probably be found in a specified place to be searched.'" *State v. Gustafson*, 300 Or App 438, 444, 452 P3d 962 (2019), *rev den*, 366 Or 493, *cert den*, ___ US ___, 141 S Ct 858 (2020) (quoting *State v. Chase*, 219 Or App 387, 392, 182 P3d 274 (2008)). And, in performing that task, we "may rely on facts asserted in the affidavit as well as reasonable inferences to be drawn from them." *State v. Daniels*, 234 Or App 533, 538, 228 P3d 695, *rev den*, 349 Or 171 (2010). "Our standard of probability requires less than a certainty, but more than a mere possibility that the items will be found in one of the specified places." *Gustafson*, 300 Or App at 444 (internal quotation marks omitted). "While adhering to the probable cause requirement, we resolve doubtful or marginal cases in favor of the preference for warrants." *Henderson*, 341 Or at 225.

The state concedes that, if the July 29 search of defendant's room was unlawful, then the warrant authorizing further examination of defendant's personal paperwork

found in the room is invalid. We agree and accept the state's concession on that point. The trial court erred in admitting evidence obtained as a result of searching defendant's personal papers under the authority of the warrant.

As to the SD card belonging to defendant, Murphy recounted the events that occurred on July 29 as told to him by Carpenter: the PPS officers had conducted a home visit at the Tom Tom Motel; Carpenter seized a "rape kit," the hand-sewn bikini; defendant's paperwork with personal information, including emails and phone numbers, concerning underage girls; two cellphones were discovered; and one of the cellphones was a smartphone that was missing its SD card, which defendant had lost near the back of the Tom Tom Motel. All of that is tainted information that we excise from the warrant application.

What remains is that Murphy recounted that a motel worker found the SD card on the motel grounds—near the back—and that the worker and a motel resident discovered pictures of pornography when it was inserted into a computer. Murphy also described how he had visited defendant in jail and asked her about the SD card that she had told Carpenter that she had lost. Murphy stated that defendant told him that she had hidden the card in a secret location and had discovered it was missing but could not explain why she had removed the SD card from the telephone and hidden it. Murphy also stated in the affidavit that he had shown the SD card to defendant, asking her if she recognized it. She replied that it resembled the SD card that she had hidden but could not say for sure if it was hers. Murphy also asked defendant about the personal information written in her personal paperwork, and defendant replied that most of what she wrote down was fictional but that some of the information was from real girls whom she had contacted on the phone and via texts.

Murphy also recounted that he personally called Trenholm and Steele to ask them about the SD card. Trenholm described where he had found the card—near the back of the motel—and that he had viewed pornography on the phone but, without his glasses, he could not see enough detail to know if the pornography included children.

Murphy added that Trenholm had said that Mitchell had denied that the SD card was his and that he turned the card over to Steele. Steele told Murphy that she turned the card over to Carpenter but had not viewed its contents.

Additionally, Murphy included in his warrant application defendant's predatory-sex-offender bulletin, which identified defendant as someone who was known to target females between the ages of six and 17 years old by using the internet. Based on his training and experience, Murphy recounted that "predatory sex offenders often collect, trade, and view child and adult pornography"; cellphones and SD cards store photos; and that persons who "seek to collect, distribute or trade sexually explicit images of minors most often use the internet to do so." Attached to the August 31 affidavit was another affidavit from several months earlier in which Murphy had stated that a phone was found on the Tom Tom Motel grounds that contained a picture of a naked boy lying on a bed or couch who appeared to be about 10 years old, and that defendant, who had previously denied possessing a cellphone, ultimately admitted that the discovered phone was hers.

We can conclude that the affidavit, even without any information that was unlawfully obtained by the PPS officers on July 29, would lead a reasonable person to believe that the SD card probably belonged to defendant and that evidence of child pornography or unlawful contact with a minor would be discovered on the SD card. It does not require anything other than reasonable inferences to conclude that it was more than a mere possibility that the SD card belonged to defendant given that defendant admitted that she had hidden a similar-looking SD card on the grounds of the motel where she lived. That the card belonged to her was even more likely given that there was a prior instance of someone finding defendant's phone on the motel grounds.

Moreover, it does not require speculation to conclude that evidence of child pornography or unlawful contact with a child would be discovered on the SD card. Because of defendant's criminal history, her designation as a predatory sexual predator known to target underage females, her admission to Murphy that she had contacted underage

girls, and the discovery of a cellphone belonging to defendant containing a naked underage boy, it is reasonable to infer that evidence of sexual crimes would be found on the SD card. Murphy's training and experience bolstered such an inference. *See Daniels*, 234 Or App at 540-41 (explaining that "the training and experience information (paperfolds contain drugs) supplies the major premise on which the conclusion (defendant possessed drugs) depends, and that major premise must be followed by a minor premise (defendant possessed a paperfold) that is supported by objective facts derived from other sources").

Consequently, we conclude that, even without the tainted evidence, the remaining evidence listed in the warrant application is sufficient for us to conclude that there was more than a mere possibility that evidence of child pornography or unlawful contact with a child would be discovered on the SD card. That is, there was enough evidence to support probable cause. However, because the subsequent search warrant application to search defendant's Gmail and Instagram accounts depended on the discovery of information contained in the seized personal papers of defendant, that search warrant lacked probable cause. Because the two other search warrants depended on information discovered from the SD card, those warrants were valid.

### III.   CONCLUSION

Defendant was unlawfully interrogated by the PPS officers in violation of Article I, section 12, and, consequently, her statements in response were not voluntarily given. The discovery of defendant's cellphones was a product of that *Miranda* violation. Further, defendant did not voluntarily consent to the search of her motel room. The trial court erred in concluding otherwise. There was enough evidence in the application for the first search warrant to establish probable cause to search defendant's SD card but not her personal papers. The application for the second search warrant lacked probable cause. The third and fourth warrants were supported by probable cause.

Reversed and remanded.